IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

**IN THE MATTER OF THE SEARCH OF:**

**1517 ROMERO STREET,**
**LAS VEGAS, NEW MEXICO 87701;**

**1034 RAILROAD AVENUE,**
**LAS VEGAS, NEW MEXICO 87701;**

**901 COMMERCE STREET,**
**LAS VEGAS, NEW MEXICO 87701;**

**615 UNION STREET,**
**LAS VEGAS, NEW MEXICO 87701; AND**

**WELLS FARGO BANK**
**LAS VEGAS BRANCH OFFICE**
**715 MILLS AVENUE,**
**LAS VEGAS, NEW MEXICO 87701**

Case No. _____

*FILED UNDER SEAL*

## AFFIDAVIT IN SUPPORT OF APPLICATIONS UNDER RULE 41
## FOR A WARRANT TO SEARCH AND SEIZE

I, Thomas D. Long, a Special Agent with the Drug Enforcement Administration, United

States Department of Justice, being duly sworn, do depose and hereby state the following:

**I.      INTRODUCTION**

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules

of Criminal Procedure for a warrant to search the following locations: (a) the property located at

1517 Romero Street, Las Vegas, New Mexico ("NM") 87701 ("**TARGET LOCATION 1**"),

which is the residence of Johnathan "Lil John" VIGIL, as further described in Attachment A1, for

the things described in Attachment B1; (b) the property located at 1034 Railroad Avenue, Las

Vegas, NM 87701 ("**TARGET LOCATION 2**"), which is the residence of Rose Ann ROMERO,

as further described in Attachment A2, for the things described in Attachment B1; (c) the property

1

located at 901 Commerce Street, Las Vegas, NM 87701 ("**TARGET LOCATION 3**"), which has

been observed as a location frequented by Robert Corbin PADILLA and associates of the

PADILLA Drug Trafficking Organization ("DTO"), as further described in Attachment A3, for

the things described in Attachment B1; (d) the property located at 615 Union Street, Las Vegas,

NM 87701 ("**TARGET LOCATION 4**"), which is the residence of Marcos "Mark" RUIZ, a

trusted PADILLA DTO associate, as further described in Attachment A4, for the things described

in Attachment B1; and (f) the office of the Branch Manager at the Wells Fargo Bank (Las Vegas

Branch) located at 715 Mills Avenue, Las Vegas, NM 87701 ("**TARGET LOCATION 5**"), which

has been identified as the work place of Sharlett M. MARTINEZ, paramour of Robert Corbin

PADILLA, member of the PADILLA DTO, and suspected DTO money launderer, as further

described in Attachment A5, for the things identified in Attachment B5. (*Hereinafter, when all*

*five (5) locations are referred to collectively they will be identified as* "**TARGET**

**LOCATIONS**"). Based on the facts set forth in this affidavit, there is probable cause to believe

that violations of 21 U.S.C. § 841, 21 U.S.C. § 846, 18 U.S.C. § 1956, 18 U.S.C. § 1957, 18 U.S.C.

§ 1071, 18 U.S.C. § 1510, and 18 U.S.C. § 2 have been committed by Robert Corbin PADILLA,

Johnathan A. VIGIL, Rose Ann ROMERO, Marcos R. RUIZ, Sharlett M. MARTINEZ, as well as

other members and associates of the PADILLA DTO, and that information and items the

government may rely upon to establish those violations are contained within the five (5) identified

**TARGET LOCATIONS**.

     2.     Contemporaneous with the service of the requested search warrants, agents from

the Drug Enforcement Administration ("DEA"), the Federal Bureau of Investigation ("FBI"),

Homeland Security Investigations ("HSI"), and the United States Marshals Service ("USMS") will

attempt to execute federal arrest warrants around central and northern New Mexico on

approximately twenty-five (25) persons for violations of Title 18 and Title 21 offenses. Twelve (12) of those people are members of the PADILLA DTO, for whom a federal grand jury in Albuquerque handed down a nineteen-count indictment on September 11, 2019. That indictment is detailed below:

## II.    PADILLA DTO INDICTMENT

### Count 1

From on or about September 17, 2018, and continuing to on or about September 10, 2019, in Bernalillo County, in the District of New Mexico, and elsewhere, the defendants, **ROBERT PADILLA, ROSE ANN ROMERO, JOHNATHAN VIGIL, ROBERT HOCKMAN, MARCOS RUIZ, LUIS SANCHEZ, ASHLEY ROMERO, TOMAS SANCHEZ, AMANDA SILVA, SERGIO VALDEZ, GENEVIVE ATENCIO,** and **JANAYA ATENCIO,** unlawfully, knowingly and intentionally combined, conspired, confederated, agreed, and acted interdependently with each other and with other persons whose names are known and unknown to the Grand Jury to commit offenses defined in 21 U.S.C. § 841(a)(1), specifically, distribution of controlled substances.

In violation of 21 U.S.C. § 846.

### Count 2

Beginning on or about September 12, 2018, and continuing until on or about September 17, 2018, in Bernalillo County and Sandoval County, in the District of New Mexico, the defendant, **ROBERT HOCKMAN**, unlawfully, knowingly and intentionally distributed a controlled substance, and the offense involved 50 grams and more of methamphetamine.

In violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A).

### Count 3

On or about October 25, 2018, in Bernalillo County, in the District of New Mexico, the defendant, **ROBERT PADILLA**, unlawfully, knowingly and intentionally possessed with intent to distribute a controlled substance, and the offense involved a mixture and substance containing a detectable amount of fentanyl (N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide).

In violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C).

### Count 4

Beginning on or about October 17, 2018, and continuing until on or about November 8, 2018, in Bernalillo County, in the District of New Mexico, the defendant, **ROBERT PADILLA**, unlawfully, knowingly and intentionally distributed a controlled substance, and the offense involved a mixture and substance containing a detectable amount of fentanyl (N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide).

In violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C).

### Count 5

Beginning on or about October 17, 2018, and continuing until on or about November 8, 2018, in Bernalillo County, in the District of New Mexico, the defendant, **ROBERT PADILLA**, unlawfully, knowingly and intentionally distributed a controlled substance, and the offense involved a mixture and substance containing a detectable amount of cocaine.

In violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C).

### Count 6

Beginning on or about October 17, 2018, and continuing until on or about November 8, 2018, in Bernalillo County, in the District of New Mexico, the defendant, **TOMAS SANCHEZ**, unlawfully, knowingly and intentionally possessed with intent to distribute a controlled substance,

4

and the offense involved a mixture and substance containing a detectable amount of fentanyl (N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide).

In violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C).

## Count 7

Beginning on or about October 17, 2018, and continuing until on or about November 8, 2018, in Bernalillo County, in the District of New Mexico, the defendant, **TOMAS SANCHEZ**, unlawfully, knowingly and intentionally possessed with intent to distribute a controlled substance, and the offense involved a mixture and substance containing a detectable amount of cocaine.

In violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C).

## Count 8

Between on or about November 22, 2018, and continuing until February 26, 2019, in San Miguel County, in the District of New Mexico, the defendant, **LUIS SANCHEZ**, knowing that he had been convicted of at least one crime punishable by imprisonment for a term exceeding one year, specifically:

1. unlawful taking of a motor vehicle (two counts),

2. forgery (two counts),

3. false imprisonment,

4. battery on a peace officer (two counts), and

5. aggravated stalking,

knowingly possessed a firearm and ammunition in and affecting interstate commerce.

In violation of 18 U.S.C. §§ 922(g)(1) and 924.

**Count 9**

Between on or about November 22, 2018, and continuing until February 26, 2019, in San Miguel County, in the District of New Mexico, the defendant, **LUIS SANCHEZ**, during and in relation to a drug trafficking crime for which the defendant may be prosecuted in a court of the United States, specifically, conspiracy as charged in Count 1 of this indictment, knowingly used carried a firearm, and in furtherance of such crime, possessed said firearm.

In violation of 18 U.S.C. § 924(c).

**Count 10**

On or about January 8, 2019, in Sandoval County, in the District of New Mexico, the defendant, **ROBERT HOCKMAN**, unlawfully, knowingly and intentionally possessed with intent to distribute a controlled substance, and the offense involved 50 grams and more of methamphetamine.

In violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A).

**Count 11**

On or about March 15, 2019, in Bernalillo County, in the District of New Mexico, the defendants, **ROBERT PADILLA** and **SERGIO VALDEZ**, unlawfully, knowingly and intentionally distributed a controlled substance, and the offense involved a mixture and substance containing a detectable amount of cocaine.

In violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C), and 18 U.S.C. § 2.

**Count 12**

On or about March 15, 2019, in Bernalillo County, in the District of New Mexico, the defendant, **ROBERT PADILLA**, unlawfully, knowingly and intentionally possessed with intent to distribute a controlled substance, and the offense involved a mixture and substance containing 28

6

grams and more of cocaine base.

In violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B).

## Count 13

On or about March 15, 2019, in Bernalillo County, in the District of New Mexico, the defendant, **MARCOS RUIZ**, unlawfully, knowingly and intentionally possessed with intent to distribute a controlled substance, and the offense involved a mixture and substance containing cocaine.

In violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C).

## Count 14

On or about March 30, 2019, in Bernalillo County, in the District of New Mexico, the defendants, **ROBERT PADILLA** and **AMANDA SILVA**, unlawfully, knowingly and intentionally distributed a controlled substance, and the offense involved a mixture and substance containing a detectable amount of cocaine.

In violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C), and 18 U.S.C. § 2.

## Count 15

On or about April 1, 2019, in Bernalillo County, in the District of New Mexico, the defendant, **ROBERT PADILLA**, unlawfully, knowingly and intentionally distributed a controlled substance, and the offense involved a mixture and substance containing a detectable amount of cocaine.

In violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C).

## Count 16

On or about April 10, 2019, in Bernalillo County, in the District of New Mexico, the defendant, **ROBERT PADILLA**, unlawfully, knowingly and intentionally distributed a controlled

substance, and the offense involved a mixture and substance containing a detectable amount of cocaine.

In violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C).

### Count 17

On or about April 10, 2019, in Bernalillo County, in the District of New Mexico, the defendant, **ROBERT PADILLA**, unlawfully, knowingly and intentionally distributed a controlled substance, and the offense involved a 280 grams and more of a mixture and substance containing a detectable amount of cocaine base.

In violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A).

### Count 18

On or about July 11, 2019, in Sandoval County, in the District of New Mexico, the defendants, **ROBERT PADILLA**, **GENEVIVE ATENCIO**, and **JANAYA ATENCIO**, unlawfully, knowingly and intentionally distributed a controlled substance, and the offense involved a mixture and substance containing a detectable amount of cocaine.

In violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C), and 18 U.S.C. § 2.

### Count 19

On or about July 11, 2019, in Sandoval County, in the District of New Mexico, the defendants, **ROBERT PADILLA**, **GENEVIVE ATENCIO**, and **JANAYA ATENCIO**, unlawfully, knowingly and intentionally distributed a controlled substance, and the offense involved a 28 grams and more of mixture and substance containing a detectable amount of cocaine base.

In violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B), and 18 U.S.C. § 2.

III.     **TARGET LOCATIONS**

| A.  TARGET LOCATION 1 | B.  TARGET LOCATION 2 |
|---|---|
| *VIGIL Residence* | *ROMERO Residence* |
| 1517 Romero Street | 1034 Railroad Avenue |
| Las Vegas, New Mexico 87701 | Las Vegas, New Mexico 87701 |
| **C.  TARGET LOCATION 3** | **D.  TARGET LOCATION 4** |
| *Suspected PADILLA Stash House* | *RUIZ Residence* |
| 901 Commerce Street | 615 Union Street |
| Las Vegas, New Mexico 87701 | Las Vegas, New Mexico 87701 |
| **E.  TARGET LOCATION 5** | |
| *MARTINEZ Employer* | |
| Wells Fargo Bank (Las Vegas Branch) | |
| 715 Mills Avenue | |
| Las Vegas, New Mexico 87701 | |

IV.     **AGENT BACKGROUND**

3.     I am a Special Agent ("SA") with the United States Drug Enforcement Administration ("DEA"), United States Department of Justice ("USDOJ"), and have been so employed since September 2017. As such, I am a law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), and I am empowered by law to conduct investigations and to make arrests for offenses enumerated in 18 U.S.C. § 2516.

4.     To become a DEA Special Agent, I graduated from the DEA Academy, Basic Agent Training, in January of 2018. The program is 19-weeks and covers all aspects of investigating drug trafficking cases. I received training on surveillance and counter-surveillance operations, undercover operations, confidential source operations, criminal law, and investigations involving federal electronic surveillance statutes, to include Title III wiretaps, drug identification, search warrant executions, and vehicle stops.

5.     My experience as a Special Agent includes, but is not limited to, conducting surveillance, interviewing witnesses, writing affidavits for and executing search warrants, and working with undercover agents and informants. I have received training and have experience in

9

the investigation of violations of the Federal drug and money laundering laws, including the offenses listed below. I have participated in the investigations of drug trafficking conspiracies, including via Title III wiretaps. I have also been the affiant, and supervising agent, of multiple Title III wiretap investigations. As a result, I am familiar with matters including, but not limited to, the means and methods used by persons and drug trafficking organizations ("DTO") to purchase, transport, store, and distribute illegal drugs, and to hide profits generated from those transactions. I also have experience in analyzing and interpreting drug codes and cryptic dialogue used by drug traffickers.

6.     Prior to my employment with the DEA, I served for six (6) years as a member of the New Mexico State Police ("NMSP"). As a member of the NMSP, I received training, and obtained experience, in the investigation of violations of the New Mexico State Criminal and Traffic Statutes, to include drug-related crimes. Also, as an NMSP Officer I served as a pilot, flight instructor, and commander of the NMSP Aircraft Section, within the organization's Special Operations Bureau. In that capacity I provided aerial support for, and participated in, numerous criminal investigations, narcotics operations, tactical team support, search and rescue operations, border security, to include surveillance of drug importation, and airborne patrol missions.

7.     I have encountered and become familiar with various tools, methods, trends, and paraphernalia and related articles utilized by traffickers in their efforts to import, conceal, manufacture and distribute controlled substances. Central to all trafficking efforts, regardless of the drug, is the trafficker's effort to make a profit from those dealings or transactions, either for the purchase of additional substances or material gain. I have been actively involved as case agent of investigations and have talked with confidential informants involved in the trafficking of narcotics, and this has formed the basis of my opinion.

10

8.      As a result of my training and experience, I am familiar with how various drugs are used and the typical distribution and trafficking methods used by drug dealers and traffickers. In addition, I am also familiar with the typical methods used by traffickers to "courier" and clandestinely transport controlled substances through airports and by common carriers such as the U.S. Mail, small parcel carriers, and freight services.

9.      This case is being investigated by the DEA. I have participated in the investigation of the offenses described below and make this affidavit based on my participation in the investigation, and based on reports and information made available to me by other agents and Task Force Officers ("TFOs"), as well as other law enforcement authorities.

10.     The facts set forth in this affidavit are known to me as a result of my investigation and interviews with other agents and law enforcement officers. These are not all the facts known to me throughout the course of this investigation, but rather only those that are essential to establish probable cause in support of the search and inspection of the **TARGET LOCATIONS**, as detailed below.

11.     I make this affidavit based upon my own personal knowledge, which is substantially derived from my participation in the investigation, as well as that of fellow agents and officers who have participated in the investigation. I have developed information I believe to be reliable from additional sources including:

        a.      Information provided by Special Agents ("SA"), Task Force Officers ("TFO"), Investigative Technical Specialists ("ITS"), and Intelligence Research Specialists ("IRS") of the DEA, and other law enforcement officials ("agents"), including oral and written reports that I have received directly or indirectly from said investigators;

b.   Results of physical surveillance conducted by agents during the investigation;

c.   A review of telephone toll records and subscriber information;

d.   Information derived from multiple T-III wiretaps;

e.   A review of driver's license and automobile registration records;

f.   Records from commercial databases; and

g.   Records from the National Crime Information Center ("NCIC").

12.   I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search certain premises. This affidavit does not set forth all of my knowledge about this matter. This affidavit is intended to show only that there is sufficient probable cause for the requested search warrant authorizing the search of the premises identified above as the **TARGET LOCATIONS**.

## V.   FEDERAL CHARGES RELEVANT TO THIS INVESTIGATION

13.   I believe there is probable cause that PADILLA, members of the PADILLA DTO, associates of PADILLA and the PADILLA DTO have committed, are committing, and will continue to commit offenses involving violations of, *inter alia*:

a.   *21 U.S.C. § 846:*  *Conspiracy to possess with intent to distribute, and to distribute, controlled substances;*

b.   *21 U.S.C. § 841:*  *Distribution of controlled substances, and possession with intent to distribute, controlled substances;*

c.   *18 U.S.C. § 1956:*  *Laundering of monetary instruments;*

d.   *18 U.S.C. § 1957:*  *Engaging in monetary transactions in property derived from specified unlawful activity;*

e.   *18 U.S.C. § 1071:*  *Harboring a fugitive;*

12

f.   **18 U.S.C. § 1510:**   *Obstruction of justice; and*

g.   **18 U.S.C. § 2:**   *Aiding and abetting.*

## VI.   EVIDENCE SOUGHT DURING SEARCH

14.   Based on my training, experience and participation in this, and in similar investigations, I believe that individuals involved in illegal trafficking of controlled substances often conceal evidence of their drug trafficking activities in their residences and businesses, or the residences and businesses of friends or relatives, and in surrounding areas to which they have ready access such as garages, carports and outbuildings. They also conceal evidence in vehicles, including vehicles outside of their residences and businesses, so that they have ready access to it and so that they can hide it from law enforcement, including law enforcement officers executing search warrants at their residences or businesses. Evidence also may be found in other areas to which a drug dealer has ready access, such as rented storage areas and safety deposit boxes, or buried underground on their property. This evidence which is discussed in detail in the following paragraphs includes controlled substances, paraphernalia for weighing, packaging and distributing controlled substances, other contraband, records, documents, as well as evidence of drug transactions, proceeds from drug sales, and valuables obtained from proceeds.

15.   Individuals involved in illegal trafficking of controlled substances often keep quantities of controlled substances on their person, in their residences, garages, outbuildings, storage areas, carports, yards, in their businesses, in the residences and/or businesses of friends or relatives, in their vehicles, in off-site storage facilities, and in other areas to which they have ready access.

16.   Individuals involved in drug dealing commonly use certain paraphernalia to package and prepare controlled substances for distribution. The paraphernalia includes, but is not

13

limited to, packaging materials *(such as plastic baggies, wrapping paper, cellophane, condoms, and film canisters)* and scales to weigh controlled substances. Drug dealers commonly store these items on their person, in their residences, in their businesses, in the residences and/or businesses of friends or relatives, in their vehicles, and in other areas to which they have ready access.

17.     Drug traffickers often maintain records of their transactions in a manner similar to the record keeping procedures of legitimate businesses. Even after the drugs are sold, documentary records are often maintained for long periods of time, even years, to memorialize past transactions, the status of accounts receivable and accounts payable, and the names and telephone numbers of suppliers, customers, and co-conspirators. These records may be maintained on paper, in the form of business and personal ledgers and diaries, calendars, memoranda, pay/owe sheets, IOUs, miscellaneous notes, money orders, customer lists, and telephone address books. These records can reflect names, addresses and/or telephone numbers of associates and co-conspirators, the sale and purchase of controlled substances including precursors, customer lists, and amounts of money owed to the trafficker by customers and by the trafficker to his/her suppliers. These items are often stored by drug dealers on their person or in their business, residences, and in vehicles.

18.     Drug traffickers often travel domestically and internationally to facilitate their trafficking. Evidence of foreign and domestic travel by persons engaged in illegal drug trafficking includes travel itineraries, airline tickets, receipts, and passports and visas, and their contents. These items are stored by drug dealers on their person or in their business, residences and surrounding garages, outbuildings, carports and yards, the residences and/or businesses of friends

14

or relatives, and in cars. Many of these items are accessible via the internet and can be downloaded and saved on the computer or other media.

19.     Drug traffickers often use storage facilities for drugs and other items related to trafficking that are at a location away from their residences and businesses. These off-site storage facilities are often commercial storage lockers and rooms. These locations are often used to store or hide drugs, contraband, money, and other valuables. Drug traffickers often keep documents and other items tending to show the existence of other stored drugs, contraband, money and other valuables in areas such as storage facilities. Those documents and other items include rental agreements, receipts, keys, notes and maps specifically concerning off-site storage rooms, lockers, and safety deposit boxes. This evidence may be found on their person or in their businesses, residences and surrounding garages, outbuildings, carports and yards, the residences of friends or relatives, and cars. This type of documentation can be stored on digital media and concealed virtually anywhere.

20.     Other evidence of transportation, ordering, possession and sale of drugs can include the following: telephone bills to show numbers called by the drug dealers *(and hence potential associates)*, overnight mail receipts, bank statements, deposit and withdrawal slips, savings books, investment statements, loan statements, other financial institution statements, and federal and state tax returns. The above items are stored by drug dealers on their person or in their business, residences and surrounding garages, outbuildings, carports and yards, the residences and/or businesses of friends or relatives, and vehicles. This type of documentation can be stored on digital media and concealed virtually anywhere.

21.     Drug traffickers usually sell their product for cash. Because large quantities of drugs can sell for thousands of dollars at the wholesale level, dealers may have thousands of dollars

in cash on hand both as proceeds of sales and to purchase supplies/inventory. In addition, drug dealers often have other assets generated by their drug business, or purchased with cash earned, such as precious metals and stones, jewelry, real estate, vehicles, and other valuables.

22.     Individuals involved in drug dealing often try to legitimize these profits from the sale of drugs. To accomplish this goal, drug traffickers may utilize foreign and/or domestic banking institutions and their attendant services, real estate and businesses, both real and fictitious. They also try to secret, transfer and conceal the money by: (a) placing assets in names other than their own to avoid detection while maintaining control; (b) laundering money through what appears to be a legitimate business or businesses; (c) hiding the money in their homes, safes and safety deposit boxes, and/or; (d) using the money to buy assets which are difficult to trace. This evidence is useful in a criminal prosecution, and it also is useful in identifying real and personal property that can be seized and forfeited by the government under existing laws. Documentation concerning this type of activity can be stored on digital media and concealed virtually anywhere.

23.     Evidence of significant, unexplained income of drug dealers, or for the acquisition and concealment of money and assets of drug sales, can be found on banking and investment account statements, credit card account statements, canceled checks, money orders, deposit slips, check and savings books, business and personal ledgers, accounting records, safe deposit box records and keys, federal and state tax records, rental receipts, rental agreements, utility bills, overnight mail receipts, telephone bills, loan statements records reflecting ownership of real or personal property *(such as deeds of trust or vehicle registration, insurance, and ownership information)*, vehicle and property rental records, lease and purchase agreements, and canceled mail. These records can be maintained on paper, but also can be maintained as electronic data on computers and other digital media. The above items are typically kept by drug dealers on their

person or in their businesses, residences and surrounding garages, outbuildings, carports, and yards, the residences of friends or relatives, and vehicles.

24.     The use of smartphones, tablets, cellular phones, and digital devices has become part of everyday life. This is also true for drug traffickers. Information stored in electronic form on all of the above-devices can provide evidence of drug trafficking. Drug traffickers frequently use some or all of these devices to communicate with co-conspirators, customers, sources of supply, and others involved in the drug trade. These communications include, but are not limited to, phone calls, text messages, Short Message Service ("SMS") messaging, Multimedia Messaging Service ("MMS") messaging, social media posts and messaging, and smartphone application messaging services. Smartphones, tablets, cellular phones, and digital devices are frequently capable of storing messages, emails, social media communications, and communications made over smartphone applications. The content of these communications will often provide evidence of drug trafficking. Numbers stored on a telephone *(such as Caller ID lists reflecting recently received calls, speed dial lists of names and/or telephone numbers, and logs of outgoing and incoming calls)* can provide evidence of who the drug dealer is calling, and thus the identity of potential associates.

25.     Information stored in electronic form on all computers and other computer-related digital media can provide evidence of drug trafficking and the identity of associates. For example, numbers stored in the telephones *(such as Caller ID lists reflecting recently received calls, speed dial lists of names and/or telephone numbers, and logs of outgoing and incoming calls)* can provide

evidence of who the drug dealer is calling, and thus the identity of potential associates. Cellular telephones and other communication devices can contain similar information.

26.     Drug traffickers often take, or cause to be taken, photographs and/or videos of themselves, their associates, their property and their drugs. They usually maintain these photographs and/or videos on their person or in their businesses, residences or cars, on computers, or in the residences of friends or relatives. Smartphones, tablets, cellular phones, digital cameras, and other digital devices, often have the capability to take still photos and videos and save them indefinitely on the device's storage medium. Digital still and video cameras are commonplace and may be used to record digital photographs or videos. All can be stored in computer hard drives and related digital media. Drug traffickers frequently use these devices to take their photographs and videos.

27.     Drug trafficking is a dangerous and violent endeavor, therefore subjects involved in illegal drug trafficking often utilize and maintain firearms and ammunition on their person or in their homes, businesses or cars in the course of conducting their illicit business to protect themselves, their drugs, and their drug profits. They also may maintain indicia of firearms such as receipts for firearms and ammunition, boxes for firearms and ammunition, firearms cleaning supplies, and instruction manuals and other documentation for firearms and ammunition. Firearms often employed for intimidation, to commit violent acts, and to avoid arrest by law

enforcement officers. Agents intend to search, and seize, any and all firearms and ammunition that may be found.

28.     I know that weapons *(including rifles, shotguns, and handguns)* are tools of the trade for drug traffickers, who often keep firearms in close proximity to themselves, and their product and proceeds, to protect them from other drug traffickers and law enforcement.

29.     Drug traffickers often conceal evidence of drug dealing in vehicles outside of their residences for ready access and to prevent detection and seizure by officers executing search warrants at their residences. This evidence, which is discussed in detail in the preceding paragraphs, includes controlled substances, indicia such as packing documents and electronic storage devices *(and their contents)*, evidence tending to show the distribution of drugs *(such as IOUs, pay/owe sheets, ledgers, lists of names and numbers, telephone address books, etc.)* digital devices such as cellular/mobile/smart telephones and tablets *(and their contents)*, and counter-surveillance devices.

30.     Documents showing who owns, occupies, or controls the location being searched also show who is responsible for the items found on the premises, including contraband and other evidence seized. Documents and items showing the identity of the persons owning, residing in or controlling the area being searched include, but are not limited to, utility and telephone bills, canceled envelopes and correspondence, outgoing answering machine messages, tax returns, keys, deeds and mortgage receipts. These documents may also be produced on computers, downloaded from online accounts or scanned into digital format and stored on computers and related digital media.

31.     Subjects will leave behind fingerprints and DNA evidence in houses, buildings, and in vehicles they operate, as well as drug residue, gun powder residue, and other physical evidence.

Agents intend to search for fingerprints, deoxyribonucleic acid ("DNA") samples, evidence of the presence of drugs, drug paraphernalia, gun powder residue, and other elements of physical evidence that may be present.

32.     A list of items agents and officers seek authority to seize during the execution of this search warrant is detailed in the respective Attachment B.

### VII.    COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

33.     As described above and in Attachment B, this application seeks permission to search for evidence and records that might be found on/in the **TARGET LOCATIONS**, in whatever form they are found. Much of the evidence and records described in the paragraphs above, and in Attachment B, can also be produced and/or stored on computers and other storage media such as a computer hard drives, external hard drives, thumb drives, secure digital cards and other types of flash memory cards, compact disks and floppy disks, personal digital assistants ("PDA"), smartphones, tablets, Black Berry devices, iPhones, iPods, iPads, digital cameras, and cellular telephones. For this reason, I submit that if a computer or storage medium is found on/in the **TARGET LOCATIONS,** there is probable cause to believe those records will be stored on that computer or storage medium. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

34.     *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises, and/or vehicle(s), for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, and/or vehicle(s), it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the

taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a. *The time required for an examination.* As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. *Technical requirements.* Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on-site.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. *Variety of forms of electronic media.* Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

21

35.     *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying computers and/or storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the computer or entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## VIII.   PROBABLE CAUSE

36.     As a result of my personal participation in the investigation of PADILLA, I am familiar with the facts and circumstances of the offenses described in this Affidavit. When I assert that a statement was made, I have either direct knowledge of the statement, or the information was provided by another law enforcement agent *(who may have had either direct or hearsay knowledge of the statement)*, and I have either spoken to the agent or have read and reviewed the agent's report.

37.     The primary target of this investigation, PADILLA, is extremely surveillance conscious and employs very effective counter-surveillance techniques in an attempt to thwart law enforcement tactics. In the course of this investigation, agents have secured multiple Title III authorizations[1] for wire and electronic surveillance over six (6) cellular telephones used by PADILLA. Interceptions over these target telephones have revealed that PADILLA conducts drug trafficking activities in Albuquerque, New Mexico, from his home at 8407 San Juan Road NE, Albuquerque, NM 87108-2425, and frequently travels to Las Vegas, New Mexico to store,

---

[1] These orders authorized the interception of wire and electronic communications over six (6) different phones used by PADILLA, a phone used by Rose Ann ROMERO, a phone used by a suspected methamphetamine source of supply, two (2) phones used by a cocaine source of supply, and PADILLA's home security camera system.

retrieve, and distribute drugs, as well as collect drug proceeds.

38.     Throughout the course of this investigation, agents have learned that PADILLA is a leader of a drug-trafficking organization operating in New Mexico ("PADILLA DTO"), including the distribution of cocaine, crack cocaine, heroin, methamphetamine, oxycodone pills and fentanyl pills. A representative of the police department in Las Vegas, NM stated that he believed that PADILLA is the main source of illegal drugs in the city of Las Vegas and that 70% of the cocaine, heroin, and methamphetamine that comes into Las Vegas, NM is sourced by PADILLA.

39.     Agents identified one suspected Mexican national as one of PADILLA's sources of supply ("SOS") and an Albuquerque resident, Jason J. JONES, as PADILLA's cocaine SOS. Agents determined that PADILLA distributes bulk quantities of cocaine that he has been obtaining from JONES for approximately twenty (20) years. During the course of this investigation, agents have obtained evidence of the drug conspiracy through surveillance, arrestee interviews, confidential source ("CS") statements, previous CS controlled purchases, interception of electronic and wire communications, and other investigative techniques. Investigators have also developed probable cause through financial inquiries to believe PADILLA, and members of the PADILLA DTO, and their co-conspirators are engaged in the laundering of monetary instruments.

### *T-III Wiretap Interceptions*

40.     During the course of this investigation, agents developed probable cause to believe that PADILLA and members of the PADILLA DTO used the following telephone numbers and camera systems to facilitate drug trafficking:

| IDENTIFIER | NUMBER | SUBSCRIBER | ADDRESS | USER |
|---|---|---|---|---|
| **PADILLA PHONE 1** | 505-231-0941 | No Subscriber Information | No Subscriber Information | PADILLA |
| **PADILLA PHONE 2** | 505-252-4600 | Robert Corbin PADILLA | 8407 San Juan Road NE Albuquerque, NM 87108 | PADILLA |
| **PADILLA PHONE 3** | 505-681-7260 | No Subscriber Information | No Subscriber Information | PADILLA |
| **SOS-2 PHONE 1** | 505-322-1975 | Fernando MARTINEZ | 2911 Ervien Lane SW; Trailer 5 Albuquerque, NM 87121 | JUAN MURILLO |
| **PADILLA PHONE 4** | 505-999-0095 | Robert Corbin PADILLA | 8407 San Juan Rd NE Albuquerque, NM 87018 | PADILLA |
| **PADILLA PHONE 5** | 505-377-6014 | OAS Phone in a Box | 295 Parkshore Drive Folsom, CA 95630 | PADILLA |
| **PADILLA PHONE 6** | 505-652-9229 | Genevieve ATENCIO | 107 Mira Sol Drive Las Vegas, NM 87701 | PADILLA |
| **ROMERO PHONE 1** | 505-699-8463 | Rose Ann ROMERO | 1034 Railroad Avenue Las Vegas, NM 87701 | ROMERO |
| **PADILLA CAMERA SYSTEM** | Xfinity Home Security | Robert Corbin PADILLA | 8407 San Juan Road NE Albuquerque, NM 87108 | PADILLA |

41.     Based upon the information derived during the course of the investigation, and toll information obtained from PADILLA PHONE 1, case agents were able to obtain a Title III wiretap for PADILLA PHONE 1. On October 11, 2018, the Honorable James O. Browning, United States District Judge for the District of New Mexico signed order 18-MR-932 authorizing the interception of wire and electronic communications to and from PADILLA PHONE 1, and the interception of wire communications to and from PADILLA PHONE 2.[2] On October 15, 2018, case agents began intercepting electronic and wire communication from PADILLA PHONE 1.

42.     On December 13, 2018, the Honorable William P. Johnson, Chief United States District Judge for the District of New Mexico signed order 18-MR-1128 authorizing the interception of wire and electronic communications to and from PADILLA PHONE 3, and the

---

[2] The interception of wire communications over PADILLA PHONE 2, pursuant to the Order, was not installed and did not commence. Upon service of the Order, Verizon Wireless reported that the IMEI number referenced in the Order, as assigned to PADILLA PHONE 2, was incorrect. As DEA Special Agent Thomas Long and AUSA Kristopher Houghton were in the process of correcting this error and presenting an amended application, it was discovered that PADILLA discontinued the use of PADILLA PHONE 2, obtained a new phone number, and a new phone bearing a different IMEI and/or MEID number. Consequently, agents never intercepted any wire communications over PADILLA PHONE 2.

interception of wire communications to and from SOS-2 PHONE 1. Agents began intercepting wire and electronic communications to and from PADILLA PHONE 3, and wire communications to and from SOS-2 PHONE 1, on December 18, 2018.

43.     On March 8, 2019, the Honorable William P. Johnson, Chief United States District Judge for the District of New Mexico signed order 19-MR-254, *(amended on March 14, 2019)* authorizing the interception of wire and electronic communications to and from PADILLA PHONE 4, PADILLA PHONE 5, PADILLA PHONE 6, ROMERO PHONE 1, and the PADILLA CAMERA SYSTEM. Agents began the interception of wire and electronic communications to and from PADILLA PHONE 4 on March 15, 2019, to and from PADILLA PHONE 5 on March 13, 2019, to and from PADILLA PHONE 6 on March 13, 2019, and to and from ROMERO PHONE 1 on March 13, 2019. Agents also began the interception of electronic communications (consisting of visual, non-verbal conduct in the form of video and images) from the PADILLA CAMERA SYSTEM on March 13, 2019.   Through these wiretaps, agents confirmed that PADILLA was operating a DTO and distributing cocaine, among other illegal drugs, throughout New Mexico.

44.     Pertinent examples of intercepts are included and explained below.

### A. *1517 Romero Street, Las Vegas, NM 87701 (TARGET LOCATION 1)*

45.     Based on my training and knowledge, knowledge of the investigation, and sharing of information with other agents, I believe that Johnathan VIGIL works for PADILLA, distributing large amounts of illegal drugs and collecting large drug debts on PADILLA's behalf. Agents identified VIGIL through records created when VIGIL sent money via a wire transfer on January 11, 2019 at approximately 6:39 p.m. In that record, VIGIL provided his name, address (**TARGET LOCATION 1**), and a telephone number. On that date, VIGIL sent $700 to a subject named Daniel

25

LUCERO[3] through a Western Union office located inside a Lowe's Supermarket at 4701 4th Street NW; Albuquerque, NM 87107.

### March 17, 2019 Wire Interceptions

46.    On March 17, 2019, at approximately 11:08 a.m., agents intercepted an incoming wire communication between PADILLA and VIGIL. Initially, VIGIL began the conversation by stating that he had approximately $2,000.00 to give PADILLA. During the conversation PADILLA and VIGIL talked extensively about how much money VIGIL owed PADILLA for illegal drugs. During the conversation, PADILLA and VIGIL discussed *"black"* (heroin) and *"blues"* (fentanyl pills). During the conversation PADILLA and VIGIL discussed how VIGIL was mixing a substance believed to be heroin. At the end of the conversation PADILLA and VIGIL agreed that VIGIL owed PADILLA approximately $36,000.00.

47.    On that same date, at approximately 3:23 p.m., agents intercepted another wire communication between VIGIL and PADILLA.  During the conversation VIGIL asked PADILLA if he was coming to Las Vegas, New Mexico that day. PADILLA stated that he had not left yet. Later that same evening, at approximately 8:48 p.m., PADILLA called VIGIL and made arrangements to pick up VIGIL so they could go pick up money. PADILLA told VIGIL to be alone when he picked him [VIGIL] up so they could talk. VIGIL agreed and the conversation ended soon after.

48.    On that same date, at approximately 9:19 p.m., GPS precise location data, obtained from AT&T, indicated that a telephone used and controlled by PADILLA was within 21 meters

---

[3] Daniel LUCERO (DOB: 04-18-1986) provided his NM Driver's License Number in order to receive the wire transfer from VIGIL. Subsequently, Agents identified LUCERO, who resides at 6308 Sumac NW, Albuquerque, NM 87120. Additionally, according to LUCERO's criminal history, LUCERO he has been charged with Contempt of Court; forty-two (42) counts of Aggravated Assault with a Deadly Weapon; Negligent Use of a Deadly Weapon; Trafficking Controlled Substances; Conspiracy; Possession of Marijuana; and Possession of Drug Paraphernalia.

of 1517 Romero Street, Las Vegas, NM 87701, which is identified as **TARGET LOCATION 1**.

### *March 20, 2019 Wire Interceptions*

49.     On March 20, 2019, agents intercepted multiple wire and electronic communications between PADILLA and VIGIL via PADILLA PHONE 6. On that date, at approximately 12:12 p.m., PADILLA initiated the electronic message exchange with VIGIL by asking VIGIL to travel to Albuquerque, New Mexico. As part of that electronic communications exchange, VIGIL told PADILLA that he would have to borrow a vehicle and PADILLA replied by telling VIGIL he would give him twenty-five (25) *"blues."*

50.     On that same date, at approximately 12:10 p.m., agents intercepted an incoming wire communication between PADILLA and VIGIL over PADILLA PHONE 6. In this conversation, PADILLA spoke to VIGIL about VIGIL borrowing a vehicle to get to Albuquerque, New Mexico, in order to obtain a resupply of drugs from PADILLA.

[BEGINNING OF CONVERSATION]

| | |
|---|---|
| **PADILLA**: | *What's up?* |
| **JOHN**: | *What you doin'?* |
| **PADILLA**: | *Kickin' it and you?* |
| **JOHN**: | *No, just seein' if I can borrow that car from our stepdad.* |
| **PADILLA**: | *Nice.* |
| **JOHN**: | *Uh-huh. Do you have any more of uh...cold and hard?* |
| **PADILLA**: | *Yeah, that's...yeah. I got both.* |
| **JOHN**: | *Alright...* |
| | [VOICES OVERLAP] |
| **PADILLA**: | *Everything...* |

[VOICES OVERLAP]

JOHN:            *...yeah. I'm out...*

[VOICES OVERLAP]

PADILLA:         *...well I'm gonna send, whatever I send you with or whatever, you know what I mean? I'll go when, take when you're out. But I need...*

[VOICES OVERLAP]

JOHN:            *Oh.*

PADILLA:         *...I just don't...my fuckin' driver's fuckin' jacked. Well her car broke down, but umm...get here as soon as you can.*

JOHN:            *Yeah, I'll take off right now. Do I just go to your house or...*

[VOICES OVERLAP]

PADILLA:         *No, don't go to my house, meet me somewhere better.*

JOHN:            *Oh, okay.*

PADILLA:         *Alright, later.*

JOHN:            *Alright, later dude.*

[END OF CONVERSATION]

51.      Agents interpret this conversation as PADILLA discussing the replenishment of VIGIL's drug inventory. PADILLA asked VIGIL when he would get to Albuquerque, New Mexico, to which VIGIL replied he had to borrow a vehicle. VIGIL also asked PADILLA if he had *"cold"* and *"hard,"* which agents interpret as methamphetamine and crack cocaine. PADILLA replied telling VIGIL that he had *"both"* and then stated *"everything."* VIGIL then told PADILLA that he was out and PADILLA told VIGIL that he was going to send an unspecified quantity of the drugs with VIGIL back to Las Vegas, New Mexico. Additionally, VIGIL asked

28

PADILLA if he should go to PADILLA's house *(8407 San Juan Road; Albuquerque, New Mexico)*, to which PADILLA replied *"no, don't go to my house, meet me somewhere better."* Agents believe that PADILLA was directing VIGIL not to meet at his residence in order to avoid law enforcement surveillance efforts.

52.     On March 20, 2019, at approximately 12:36 p.m. and 12:37 p.m., respectively, agents intercepted two (2) outgoing wire communications from PADILLA to VIGIL, then to a female subject identified as Judy PADILLA. PADILLA directed VIGIL to go to Judy PADILLA's house and pick up *"cash"* from Judy PADILLA before he leaves to travel to Albuquerque, New Mexico. Shortly after VIGIL agreed and both parties end their conversation, PADILLA called Judy PADILLA and instructed her to get *"money"* together quickly and give it to VIGIL. Judy PADILLA agreed and told PADILLA that she would do it.

53.     Agents believe that PADILLA was directing VIGIL to collect the proceeds from drug sales made in Las Vegas, New Mexico and take the money to PADILLA when he [VIGIL] drove to Albuquerque, New Mexico.

54.     On March 20, 2019, at approximately 3:13 p.m., agents intercepted an outgoing wire communication from PADILLA to VIGIL regarding VIGIL's location and expected time of arrival. PADILLA instructed VIGIL not to go to PADILLA's house and to meet PADILLA on a street, near a car dealership, that PADILLA knows does not have surveillance cameras. PADILLA directed VIGIL where to park his vehicle and further told VIGIL he [PADILLA] would instruct VIGIL where to meet with PADILLA. At approximately 3:20 p.m., PADILLA instructed VIGIL on where to go and as VIGIL was approaching VIGIL saw PADILLA. VIGIL told PADILLA that he was driving a gold Saturn and PADILLA instructed VIGIL to have everything *(money)* ready to exchange in the street. VIGIL asks PADILLA if he wanted to do it *(exchange)* in the street to

29

which PADILLA replied yes.

55.      Agents interpret this meeting between PADILLA and VIGIL as the coordination of the exchange of the drug proceeds from Las Vegas, New Mexico for a new drug supply that VIGIL would then distribute in Las Vegas, New Mexico. In a subsequent wire communication intercepted at approximately 3:23 p.m., it appeared as if PADILLA was informing VIGIL that he provided him with black tar heroin, crack cocaine, and fentanyl pills.

### *April 4, 2019 Wire Interceptions*

56.      On April 4, 2019, at approximately 10:16 p.m., agents intercepted a wire communication between PADILLA and VIGIL via PADILLA PHONE 6 regarding drug trafficking.

[CONVERSATION IN PROGRESS]

| | |
|---|---|
| **PADILLA:** | *I'm gonna be gone, I'm gonna leave around noon. [U/I] to Phoenix. But if, [U/I] get it back to Vegas around noon when I pick up my chick, 'cause my chick's there. You know what I mean. I can hook 'em up but…Tell her I'll trade her for any of those [U/I] you know what I mean? I'll hook her up.* |
| **VIGIL:** | *Yeah, she'll do a trade.* [PAUSE] *She'll fuckin, she'll get any* [U/I] *she steals all kinds of meat* [U/I] |
| **PADILLA:** | *She should've gotten it today.* |
| **VIGIL:** | *Sh' she was all fuckin' sick all day 'cause she's been trying to call [U/I] because she still owes me money too. I didn't even give her a pill all day 'cause I was all like, "fuck you, you still owe me money."* [CHUCKLES] |
| **PADILLA:** | *She don't ever try to temper your shit to jack you?* |
| **VIGIL:** | *Fuck no its all, she doesn't know where it's at. Nobody will ever find out where that shit's at. I always go by myself.* |
| **PADILLA:** | *You have to [U/I] fuckers fuck it.* |

30

VIGIL:  *My auntie always like, she'll always look where I put it [U/I] happen during the day but…at night she'll [U/I] no one will even know. Yeah but uh [U/I] more or no.*

PADILLA:  *What?*

VIGIL:  *Pale hard.*

PADILLA:  *Uh for sure, Pale Hard I'm not sure but um…yeah, we'll figure it out. See I might go, the, see this is my problem, I have to go to Burque, my chick might drive tonight, Vegas to Burque and then we're going to leave to Phoenix. Or if not, if I have to go for it I'll get it to you.*

VIGIL:  *All right. Yeah just let me know.*

PADILLA:  *Alright let me see actually, [U/I] waiting for a homie to call me back actually right now.*

VIGIL:  *Yeah just let me know.*

PADILLA:  *Okay later.*

VIGIL:  *Alright late.*

[END OF CONVERSATION]

57.     Agents interpret this conversation between PADILLA and VIGIL to be related to drug trafficking, including where/how VIGIL hides his drugs. VIGIL relayed to PADILLA that his *"auntie"* owes VIGIL money and, due to this fact, VIGIL refused to provide her drugs. PADILLA asked VIGIL if she ever tried to locate VIGIL's drug stash and steal it from him. VIGIL emphatically told PADILLA no stating, *"Fuck no its all, she doesn't know where it's at. Nobody will ever find out where that shit's at. I always go by myself."* Then VIGIL further told PADILLA, *"My auntie always like, she'll always look where I put it [U/I] happen during the day but… at night she'll [U/I] no one will even know. Yeah but uh [U/I] more or no."* Agents interpret these statements as VIGIL telling PADILLA that he [VIGIL] does not store his drug supply in, or near, his house during the evening hours. VIGIL stated that he hides his drugs in a place known only to

31

him and that he always goes alone to the location in order to retrieve his drugs in order to distribute them. Through this statement, agents believe that VIGIL keeps his drugs in, and/or near, his house during the hours he is actively distributing them, then hides them in a location, known only to him, during the times he isn't actively selling. He further stated that his *"auntie"* has attempted to locate his drug stash but has been unsuccessful.

58.     Additionally, agents believe that during this conversation VIGIL told PADILLA that he needs more crack cocaine, which he referred to as *"pale hard."* PADILLA told VIGIL that he may have some difficulty retrieving it because he needed to go to Albuquerque, then onto Phoenix, Arizona, and that his girlfriend may be present. PADILLA did state that if he did not go to Phoenix, Arizona that he would get VIGIL the drugs he requested.

59.     On September 10, 2019, I received information regarding VIGIL from an FBI case agent involved in the concurrent FBI investigation Las Vegas, New Mexico. An FBI Confidential Human Source ("CHS") relayed to the FBI case agent that the CHS knows VIGIL well, and confirmed that VIGIL is currently (as recent as September 10, 2019) living at **TARGET LOCATION 1** and selling powder cocaine, "M-30s" or "smurfs" (which agents believe are fentanyl pills), and has a couple of guns for sale. The FBI case agent considers this CHS to be a reliable source of information. I believe this information indicates that despite PADILLA's status as a federal fugitive, VIGIL is still distributing cocaine on behalf of the PADILLA DTO at PADILLA's direction. The CHS information is corroborated by several intercepted conversations during which VIGIL and PADILLA discussed the sale of firearms; specifically, VIGIL was interested in buying firearms from PADILLA for himself and others. The CHS information is also corroborated by the calls intercepted over PADILLA PHONE 6, as well as VIGIL's current driver's license, which lists his address of record as "1517 Romero Street, Las Vegas, NM 87701."

60.     Due to the amount of drugs and money moved by VIGIL on behalf of PADILLA and the PADILLA DTO, his large debt to PADILLA, and the current confirmation that VIGIL continues to traffic drugs, there is probable cause to believe that evidence of illicit drug trafficking, records, drug proceeds, and firearms will be located within **TARGET LOCATION 1**.

B.   ***1034 Railroad Avenue; Las Vegas, NM 87701 (TARGET LOCATION 2)***

61.     Based on the law enforcement surveillance, the use of a pole camera, and wire interceptions, I believe that the above address is the current primary residence of ROMERO.

***November 4, 2018 Wire Interceptions***

62.     On November 4, 2018, at approximately 10:24 a.m., agents intercepted a wire communication they believed involved the distribution of illegal drugs. Agents interpreted PADILLA's statement to ROMERO that he couldn't *"even find white right now"* PADILLA was referring to the fact that he could not obtain any cocaine (*which is often referred to as* "white"). Additionally, during the conversation, PADILLA told ROMERO "Delfi" *(a PADILLA DTO associate agents have identified as Delfino SALAZAR)* is ready to give ROMERO money owed to PADILLA. During the conversation, PADILLA also asked ROMERO *"how many pills"* she sold, and ROMERO replied by telling PADILLA she has about 30-35 pills[4].  PADILLA then asked ROMERO if there are "still 100 pills there" and ROMERO replied, "yes," stating that she still has the "other bag." PADILLA then stated that bag (referring to ROMERO's bag) has 200 pills. Later

---

[4] Agents believe the pills that PADILLA and ROMERO were discussing during this conversation are fentanyl pills, created to look like oxycodone pills. On October 24, 2018, agents intercepted a wire communication, over PADILLA PHONE 1, between PADILLA and one of his sources of supply (SOS). In that conversation PADILLA agreed to the purchase of 2,000 fentanyl pills for $13,000. PADILLA was to pay $6,500 for 1,000 and receive the remainder of the fentanyl pills on consignment. On October 25, 2018, agents intercepted another wire communication between PADILLA and the SOS indicating that PADILLA received the fentanyl pills. Agents then followed the SOS to a location in Albuquerque where the SOS abandoned his vehicle. Agents believe the pills being discussed in the above conversation between PADILLA and ROMERO were fentanyl pills PADILLA received during this transaction.

in the conversation PADILLA asks ROMERO to travel to Albuquerque that day. ROMERO replied that she would travel to Albuquerque the following day. PADILLA then told ROMERO that he [PADILLA] needs the pills that day and asked ROMERO to count the pills. PADILLA then asked ROMERO how much ROMERO gave PADILLA already for ten (10) pills, to which ROMERO replied that she will owe PADILLA for twenty-five (25) pills.

63.     As the conversation continued, PADILLA told ROMERO to make him a bag of 100 pills. ROMERO told PADILLA that she had already separated the pills into two (2) bags. PADILLA instructed ROMERO to ensure there were 100 pills per bag, that way he [PADILLA] can sell 200 pills.

64.     On November 4, 2018, at approximately 3:58 p.m., agents intercepted another conversation between PADILLA and ROMERO that appeared to pertain to the sale of illegal pills. ROMERO told PADILLA *"I text Pie and Pie said he had six hundred (600)."* Agents believe that PADILLA is referring to Luis "Payaso" SANCHEZ in this conversation. Agents also believe that ROMERO "six hundred" meant $600.00. Additionally, during the conversation PADILLA told ROMERO to call SANCHEZ and instruct SANCHEZ to give *"whatever he has"* to ROMERO. Agents believe that PADILLA was trying to obtain money owed to him [PADILLA] from previous drug sales.

65.     Also, during this conversation PADILLA stated that he was going to have a subject, known to agents as Brandon SANDOVAL, pick up money ROMERO owed PADILLA. ROMERO also stated that she has a customer (unidentified female) who keeps coming for *"those things."* PADILLA replied by saying that he will give ROMERO *"more"* tomorrow. Case agents believe that *"those things"* are illegal drugs, perhaps the fentanyl pills ROMERO and PADILLA had been discussing, and the unidentified female is purchasing said illegal drugs frequently. So

frequently that PADILLA told ROMERO that he will provide more of the illegal drugs the next day to keep up with the demand.

66.   On November 4, 2019, at approximately 5:38 p.m., agents intercepted another wire communication between PADILLA and ROMERO that appeared to be a continuation of the conversation that took place at approximately 3:58 p.m. on that same day. Agents believe that when ROMERO told PADILLA *"It's all done"* she relayed to PADILLA that she had collected the money owed to PADILLA.

### March 27, 2019 Wire Interceptions

67.   On March 27, 2019, at approximately 11:59 a.m., agents intercepted a wire communication, over ROMERO PHONE 1, between an unidentified female ("UF") and ROMERO. The female begins by telling/asking ROMERO *"Hi. Uhm…on your…on the usual, is it just the shots?"* ROMERO told the UF *"no,"* then the female asks ROMERO *"What is it then?"* ROMERO told the UF *"the two (2), two (2), uh,"* before the UF interrupts ROMERO to ask ROMERO if it is *"two (2) and twelve (12)."* The UF then tells ROMERO that if she [ROMERO] does not want the UF to come to just let her know. Based on my experience and knowledge of the investigation, I understand this call as the UF asking ROMERO for prices on what I believe to be illegal narcotics. ROMERO's reply to the UF appears to indicate that ROMERO was in fact selling *"two (2) and twelve (12)"* which also appear to be a coded description of drugs. Based on the female talking about *"coming"* to where ROMERO was, I believe that ROMERO likely stores and distributes various amounts and types of illegal narcotics at her home.

### April 5, 2019 Wire Interceptions

68.   On April 5, 2019, at approximately 10:46 a.m., ROMERO received a text from an unidentified subject that stated *"Friend I haven't gotten paid yet from here, I'm asking you if you*

*could help me out with something please, I know I still owe you 20$ and once I get Féria or my check I'll pay you friend."* On that same date, at approximately 10:48 a.m., ROMERO replied to the unidentified subject with, *"Hang on let me check."* On that same date, at approximately 10:52 a.m., the unidentified subject replied back to ROMERO with, *"Please friend even if it's for a bowl I promise friend I wouldn't leave you hanging."* ROMERO then agrees to help this person out with their need and indicated that the person should come to ROMERO. Based on my experience, I understand that ROMERO was owed money by this person, yet they were asking for ROMERO to give them a *"bowl."* I understand this to likely mean a form and/or quantity of illegal narcotics. ROMERO directs the person to come to ROMERO, which I believe means that the person should go to ROMERO's house in order to obtain the drugs.

69.     On April 5, 2019, at approximately 6:09 p.m., agents intercepted an electronic communication between ROMERO and a different unidentified subject. The unidentified subject asked ROMERO about her current location and informed ROMERO that the unidentified subject had ROMERO's money. ROMERO stated that ROMERO is *"home"*, and the unidentified subject replied with *"I'll go like in 40 min. I have ur money plus do u have any."* Based on my experience and knowledge of this investigation, I believe that this unknown individual was going to go to ROMERO's home to pay a drug debt that they owed ROMERO. Agents further believe that when the unidentified subject asked ROMERO if she had *"any,"* the subject was asking ROMERO if she had any drugs.

### April 10, 2019 Wire Interceptions

70.     On April 10, 2019, at approximately 5:01 p.m., agents intercepted an outgoing phone call placed by PADILLA on PADILLA PHONE 6 to ROMERO on ROMERO PHONE 1. Both phones were being monitored by an authorized T-III wiretap.

[BEGINNING OF CONVERSATION]

**ROMERO**:      *Hello…*

                 [VOICES OVERLAP]

**PADILLA**:     *Hello.*

**ROMERO**:      *…hello!*

**PADILLA**:     *You're outside in the wind?*

**ROMERO**:      *Yes, I was just trying to open my door, what are you doing?*

**PADILLA**:     *Nothing. What's so…*

                 [VOICES OVERLAP]

**ROMERO**:      *Uh.*

**PADILLA**:     *…important?*

**ROMERO**:      *Hey, um…I talked to…um…somebody, and they told me to tell you to be careful.*

**PADILLA**:     *Somebody?*

**ROMERO**:      [CLEARS THROAT] *Well, uh…Ray…hu, hu…and he said, like…*

**PADILLA**:     *Huh?*

**ROMERO**:      *Ray.*

**PADILLA**:     *Said what.*

**ROMERO**:      *Well, the same thing, but…he does…he said…he…you know, didn't call you. But, if I talk to you to tell you to call him, because he didn't call you or whatever. But…*

**PADILLA**:     *My cousin Ray?*

**ROMERO**:      *Yeah. Yeah.*

| | |
|---|---|
| PADILLA: | *What did he say exactly?* |
| ROMERO: | *The same thing that…me and you* [CHUCKLES] |
| PADILLA: | *Uh…uh, what…oh, about those things?* |
| ROMERO: | *That, and that…that…they want you really, really bad.* |
| PADILLA: | *The who does?* |
| ROMERO: | *The Fed* [SNIFFLES] |
| PADILLA: | *How Ray would know?* |
| ROMERO: | *He said that somebody told him.* |

[BACKGROUND: CHIME]

| | |
|---|---|
| PADILLA: | *Fuck…* |

[VOICES OVERLAP]

| | |
|---|---|
| ROMERO: | *I just…* |
| PADILLA: | *…*[U/I] |
| ROMERO: | *I saw him at the store, and he…he's like, "I didn't call him myself, 'cause I don't wanna call." He said, "but if you talk to him, tell him to call me or whatever."* |
| PADILLA: | *Okay, I'll call him now.* |
| ROMERO: | *Bye. Okay.* |
| PADILLA: | *Okay, bye.* |
| ROMERO: | *Bye.* |

[END OF CONVERSATION]

71.     Agents interpret this conversation between PADILLA and ROMERO as ROMERO warning PADILLA that Federal law enforcement agents were investigating PADILLA. ROMERO told PADILLA that she was provided this information from an individual named *"Ray"* who PADILLA identified as his cousin. PADILLA inquired regarding *"Ray's"* knowledge and

38

ROMERO stated that *"somebody"* told him [Ray].

72.     Through information obtained early on in this investigation, agents believe that PADILLA has source(s) of information in the Las Vegas Police Department and/or the San Miguel County District Attorney's Office. Lead agents believe these source(s) of information may provide PADILLA information regarding any investigations targeting PADILLA as well as provide him information regarding impending execution of search warrants.

73.     On April 10, 2019, at approximately 5:02 p.m., agents intercepted an outgoing phone call that lasted approximately 1 minute and 30 seconds, placed by PADILLA on PADILLA PHONE 6 to a subject identified as Ray HERRERA using (505) 429-1073. During the previous phone conversation *(Session #9029)* with ROMERO, PADILLA identified this subject as his *"cousin Ray."*

[BEGINNING OF CONVERSATION]

| | |
|---|---|
| **RAY:** | *Hello.* |
| **PADILLA:** | *What's going on, cousin?* |
| **RAY:** | *Nothing, and you, bro?* |
| **PADILLA:** | *Nothing, what are you up to?* |
| **RAY:** | *Nothing, nothing, I just talked to Rosana.* |
| **PADILLA:** | *Yeah, she told me to call you.* |
| **RAY:** | *Be careful.* |
| **PADILLA:** | *That bad, uh?* |
| **RAY:** | *Be careful, bro. Just be careful.* |
| **PADILLA:** | [SNIFFLES] *Fuck. What did you hear? Or, when…when can I see you?* |

39

| | |
|---|---|
| **RAY:** | *Uh, some fucker that I know, that works for the hoodas [PH] those at the little window.* |
| **PADILLA:** | *Uh, he works for the city?* |
| **RAY:** | *Yeah, I guess he's working with them fools.* |
| **PADILLA:** | *Uh, okay.* |
| **RAY:** | *[U/I] and all over here.* |
| **PADILLA:** | *But is...* |
| **RAY:** | *But, just stay alert, brother.* |
| **PADILLA:** | *Is it just the city or is it...uh...or higher?* |
| **RAY:** | *I think higher, bro. I'm just telling you to stay alert, so...* |
| **PADILLA:** | *No, no, I am twenty-four (24) seven (7). But, if it's way higher the city won't have wind of it, they don't talk to the city, 'cause they think that they, uh... they have all kinds of employees there.* |
| **RAY:** | *Well, I don't know. But, I'm just saying.* |
| **PADILLA:** | *Probably the State, the fuckers.* |
| **RAY:** | *Just be careful, bro. I just...I wanted to talk to you, but...I don't wanna talk to you on the phone, bro.* |
| **PADILLA:** | *I'll go see you...* |
| | [VOICES OVERLAP] |
| **RAY:** | *You know what I mean?* |
| **PADILLA:** | *...I'm in Vegas. I'll see you right now. I'm gonna go find you right now.* |
| **RAY:** | *Alright, I'm gonna be cruising around.* |
| **PADILLA:** | *Okay...* |
| | [VOICES OVERLAP] |
| **RAY:** | *Okay, brother...* |

40

| PADILLA: | *...later.* |
|---|---|
| RAY: | *...give me a call.* |
| PADILLA: | *Later, cousin. Thank you.* |
| RAY: | *Later, brother. Be careful.* |

[END OF CONVERSATION]

74.     This conversation was a follow-on to the previous intercepted wire communication *(Session #9029)* between PADILLA and ROMERO. This conversation, between PADILLA and Ray HERRERA (*hereafter referred to as* "HERRERA"), took place approximately one (1) minute after the end of the previous conversation between PADILLA and ROMERO. PADILLA contacted HERRERA regarding the information provided by ROMERO.

75.     In this conversation HERRERA told PADILLA to be careful because HERRERA believes that law enforcement is actively targeting PADILLA. As this conversation progressed, PADILLA was trying to ascertain who HERRERA thought was targeting him. HERRERA believed it was an agency *"higher"* than the City of Las Vegas, however HERRERA's apparent source of information worked for the City of Las Vegas, New Mexico. PADILLA doesn't believe that the investigation is at the Federal level because Federal law enforcement agencies don't share information with the Las Vegas Police Department due to PADILLA's influence within the department. To that end, PADILLA told HERRERA he believes it may be the New Mexico State Police who is investigating him.

76.     Additionally, it is important to note that in this conversation HERRERA told PADILLA that he didn't want to talk on the phone. Agents believe this is an indication of both subjects' awareness of law enforcement tactics and is indicative of their attempts to conceal their illicit activities. As the conversation terminated, PADILLA told HERRERA that he was going to

41

find him in order to speak in person.

77.     On September 13, 2019, SA Jeffrey Simms drove by 1034 Railroad Avenue, Las Vegas, NM 87701 and observed a brown 2014 Nissan Altima, bearing New Mexico License Plate number 948 TZJ, parked in front of **TARGET LOCATION 2**. A check of New Mexico Motor Vehicle Division records indicate that vehicle is registered to Rose Ann ROMERO with an address of 1034 Railroad Avenue; Las Vegas, NM 87701. Additionally, a review of ROMERO's social media account shows a photograph of ROMERO's daughter, uploaded on August 19, 2019, appearing to memorialize ROMERO's daughter's first day of school. The photograph of ROMERO's daughter was taken on the front porch of **TARGET LOCATION 2**, inside a short walled-in area in the vicinity of the front door. Finally, a PNM bill from September 5, 2019, shows "ROSEANN ROMERO" as the electricity subscriber for "1034 Railroad Ave, Las Vegas, NM 87701."

78.     The above information further solidifies agents' belief that ROMERO is a long-term drug trafficker who plays an integral role in the day-to-day operations of the PADILLA DTO and maintains, processes, and distributes illegal drugs from her home, identified as **TARGET LOCATION 2**. Additionally, it is apparent that PADILLA's network feeds information back to PADILLA regarding indications and information they obtain regarding law enforcement efforts to investigate and/or apprehend him. Based on ROMERO's long-standing relationship with PADILLA as one of his drug distributors, and her use of **TARGET LOCATION 2** to traffic illegal drugs, agents believe there is probable cause to believe that ROMERO continues to use **TARGET LOCATION 2** to traffic illegal drugs and maintain evidence of the PADILLA DTO.

C. *901 Commerce Street; Las Vegas, NM 87701 (TARGET LOCATION 3)*

79.     Through the efforts of a reliable confidential source ("CS"), agents received information that PADILLA was still actively utilizing PADILLA PHONE 6[5]. Based upon information derived during the course of the investigation, in addition to the fact the Honorable Jerry H. Ritter, United States Magistrate Judge, issued an arrest warrant (19-MJ-2464) on August 8, 2019, agents demonstrated sufficient probable cause to obtain a precise Global Positioning System ("GPS") location data for PADILLA PHONE 6. Therefore, on August 8, 2019, the Honorable Jerry H. Ritter, United States Magistrate Judge, issued search and seizure warrant (19-MR-945) authorizing the interception of precise GPS location data (*hereafter referred to as* "Pings" *or* "Ping Data"), from PADILLA PHONE 6, for a period of thirty (30) days. In accordance with the approved search and seizure warrant, on August 8, 2019, at approximately 2:10 p.m., agents began receiving ping data from PADILLA PHONE 6.

80.     The primary purpose for the interception of ping data over PADILLA PHONE 6 was to facilitate the location and safe apprehension of PADILLA within the shortest possible timeframe. Agents utilized the ping data to track PADILLA's movements within Las Vegas, New Mexico and, on August 13, 2019, agents intercepted multiple pings indicating that PADILLA was at **TARGET LOCATION 3**. The address, identified as **TARGET LOCATION 3**, was previously unknown to agents during this investigation. The records from San Miguel County, New Mexico show the owner of **TARGET LOCATION 3** to be a subject named Gene GONZALEZ JR[6] with an address of 1303 Pecos Street, Las Vegas, NM 87701. However, on

---

[5] Pursuant to an authorized T-III wiretap (19-MR-254) signed by the Honorable William P. Johnson, Chief United States District Judge, for the District of New Mexico, agents intercepted wire and electronic communications over PADILLA PHONE 6 from March 3, 2019 through April 11, 2019.
[6] Gene GONZALEZ JR is not a subject known to investigators and, up until this point, his name has not come up

August 13, 2019, at varying times throughout the day, ping data indicated that PADILLA PHONE 6 was at **TARGET LOCATION 3**, with as small of an error as seven (7) meters *(22.97 feet)* to thirty-five (35) meters *(114.83 feet)*.

| DATE | TIME | RADIUS (METERS) | RADIUS (FEET) |
|---|---|---|---|
| August 13, 2019 | 2:46 p.m. (MST) | 35 | 114.83 |
| August 13, 2019 | 3:18 p.m. (MST) | 7 | 22.97 |
| August 13, 2019 | 6:26 p.m. (MST) | 13 | 42.65 |
| August 13, 2019 | 6:43 p.m. (MST) | 9 | 29.53 |
| August 13, 2019 | 6:59 p.m. (MST) | 11 | 36.09 |

81.     On August 14, 2019, TFO Oscar Villegas observed PADILLA's distinctive 2016 Black Chevrolet Corvette[7] parked, inside the curtilage, and next to the house identified as **TARGET LOCATION 3**. On August 15, 2019, agents and officers from the DEA Albuquerque District Office conducted surveillance in Las Vegas, New Mexico in anticipation of executing a search and seizure warrant at the Best Western Hotel, Room 310-A located at 2020 South Grand Avenue in Las Vegas, New Mexico. Agents had information, obtained through ping data and the issuance of administrative subpoenas, that PADILLA and MARTINEZ were guests at the Best Western Hotel.

82.     On that same date, TFO Oscar Villegas observed PADILLA's 2016 Black

---

during this investigation. A check of NCIC shows no criminal record for Gene GONZALEZ.
[7] PADILLA acquired a Black 2016 Chevrolet Corvette, bearing New Mexico License Plate Number 06178UNM. The Corvette is currently registered to a subject identified as Charles CASTILLO (DOB: 09-07-67). PADILLA has been observed by sources, as well as a DEA TFO driving this distinctive Chevrolet Corvette within the city of Las Vegas, New Mexico.

Chevrolet Corvette[8] parked within the curtilage of, and next to the house, identified as **TARGET LOCATION 3**. On this date, TFO Villegas noted that PADILLA's Corvette was parked in approximately the same location, however, PADILLA's Corvette had been moved deeper into the property. TFO Villegas also noted that other vehicles, known to be driven by PADILLA, to include a 1995 Red Dodge Ram 1500 pickup truck, bearing New Mexico License Plate Number 5068NMSU, were also parked within the curtilage of **TARGET LOCATION 3**. Additionally, on that same date, TFO Villegas observed PADILLA's son, Devyn PADILLA, arrive and park within the curtilage of **TARGET LOCATION 3** in a Red Cadillac CTS purchased for him by his father, PADILLA, which is also the subject of a forfeiture allegation within the pending indictment.

83.    Agents believe that PADILLA is actively attempting to conceal the location of his assets/vehicles. On August 25, 2019, at approximately 7:28 p.m., agents intercepted a wire communication between PADILLA and a DEA CS via a consensual wiretap. In that conversation, PADILLA told the CS that he has his vehicles scattered, *"Nuh they freaking…they took they…they repossessed my fucking Yukon, and my two (2) fucking…the cars they couldn't get. But, they got my…they got two (2) Harleys and the Yukon, that's all they could find. Everything else is scatter everywhere…all over the place."* Considering PADILLA's statement to the CS, coupled with TFO Villegas' observations on August 14 and August 15, 2019, agents believe that PADILLA is using **TARGET LOCATION 3** as a location to hide his vehicles, conceal evidence, and mask his whereabouts from law enforcement.

84.    Considering these observations, agents believe that **TARGET LOCATION 3** is a house/location frequented by PADILLA and members of the PADILLA DTO. Agents further

---

[8] PADILLA's Black 2016 Chevrolet Corvette has been included in the recent indictment as personal property to be forfeited as it is believed that PADILLA is paying for this vehicle with drug proceeds.

believe that **TARGET LOCATION 3** will contain evidence of drug trafficking, and drug trafficking proceeds, related to the PADILLA DTO.

D. *615 Union Street; Las Vegas, NM 87701 (TARGET LOCATION 4)*

85.     Based on information obtained during this investigation, agents believe that the above address is the current primary residence of RUIZ and that he shares this residence with his relatives. Currently agents believe that **TARGET LOCATION 4** is occupied by Patricia Jean VIGIL, Alfred Anthony RUIZ[9], and Debbiemae Valarie LUCERO. Alfred RUIZ has accumulated a lengthy and violent criminal history dating back to 1984. His criminal history includes charges including trafficking of controlled substances and possession of controlled substances. Agents believe that since his release from the San Miguel County Detention Center in April of 2019, Alfred RUIZ is living at **TARGET LOCATION 4** and would participate in, maintain, and even support, Marcos RUIZ' drug trafficking activities while he is incarcerated.

*March 15, 2019 Wire Interceptions*

86.     On March 15, 2019, at approximately 9:30 p.m., agents intercepted an incoming wire communication that lasted approximately 3 minutes and 34 seconds, placed by JONES, using JONES PHONE 1, to PADILLA over PADILLA PHONE 6. Agents initially tracked JONES as UM3453, but subsequently identified JONES, who resides in Albuquerque, New Mexico, as PADILLA's cocaine source of supply. PADILLA appears to be complaining to JONES regarding the quality of the cocaine that JONES provided to PADILLA, and that PADILLA subsequently provided to his cousin Marcos RUIZ.

---

[9] Alfred Anthony RUIZ (DOB: 02-17-1963), believed to be Marcos RUIZ's brother, has accumulated a lengthy and violent criminal history dating back to 1984. His charges include Trafficking of Controlled Substances, Possession of Controlled Substances, False Imprisonment, Burglary, Tampering with Evidence, and Probation Violations. Alfred Anthony RUIZ was released from the San Miguel County Detention Center on April 23, 2019.

[BEGINNING OF CONVERSATION]

PADILLA:        *Yo.*

JONES:          *Hey, what's up?*

PADILLA:        *Shit ain't worth a fuck.*

JONES:          *Dawg, I...I've been messing with that all fucking week.*

PADILLA:        *I don't know. Well...*

                [VOICES OVERLAP]

JONES:          [U/I]

PADILLA:        *...I thought* [U/I]

JONES:          *You know...you know, I don't get down that way, dawg...*

                [VOICES OVERLAP]

PADILLA:        [U/I]

JONES:          *...I don't get down that way.*

PADILLA:        *My cousin did one (1), he said, he got half. I'm doing it right now, I'm doing two (2)* [SIGHS] *like that, 'cause I'm gonna get a whole one (1) out of it.*

JONES:          *Dawg, there's no fuck...uh...dawg, this dude don't get down, I mean uh...you know what? Just leave it, because... I ain't gonna' mess with this shit, dawg, because...I mean, I...I mess with that all fucking week, dawg. You know, we don't get down that way...*

                [VOICES OVERLAP]

PADILLA:        *I know, I know, but...*

JONES:          *...[U/I] dawg.*

PADILLA:        *I never complain. I never complain...*

                [VOICES OVERLAP]

JONES:          *No, I know you don't, dawg. I'm not uh* [STAMMERS] [U/I]

PADILLA: …[U/I] *I'll tell you right now in a minute, exactly what I get back. It don't look like two (2), but uh…I'll tell you.*

JONES: *No* [U/I] *yeah, man. I mean, it's not, I mean…because…* [SIGHS] *I mean…*

[VOICES OVERLAP]

PADILLA: *Uh, honestly don't think* [U/I]

JONES: *…if I think about it, I've been…I've been fucking that bitch* [U/I] *the same thing for a week, you know what I mean. You know I don't get down that way. Just call me* [U/I] *and I mean…*

[VOICES OVERLAP]

PADILLA: *I did* [U/I] *I got two (2) minutes on it, probably 3 minutes.*

JONES: *No, no, no! 'cause yeah, your people just gotta be bull-shitting, I mean, 'cause that one hits right away, and it's tight. But, uh…the color is not…doesn't stick* [U/I]…

[VOICES OVERLAP]

PADILLA: *I know the color…no, uh…I did it perfect though. I'll know if my people just fucked up or not, right now.*

JONES: *Well, you now…you know what the bad thing Rob? I know you never bitch, but they're probably thinking…it probably was that way by how it fucking looked, you know people bitch…*[U/I]

[VOICES OVERLAP]

PADILLA: *Yeah, but my cousin* [U/I] *you know what I mean? He knows better than just to complain.*

[PAUSE]

JONES: *Well, I'll wait. I'll talk to you on the phone, dawg, because I mean…you know how* [U/I]…

[VOICES OVERLAP]

PADILLA: [U/I]

**JONES:** *...huh?*

**PADILLA:** *Yeah, I know, he got me all scared, and I was like, "fuck!"*

**JONES:** *No, dawg. I mean, because...you know what? To be honest with you, everything I fuck with...'cause I got some complaining mother fuckers, even if it's like one (1) down, they bitch. So, I...I already fucked the whole, so [U/I]*

[VOICES OVERLAP]

**PADILLA:** *That's what I said, I told him, I've been [U/I] with my boy for twenty (20) fucking four (4) years. So, it's impossible.*

[PAUSE]

**JONES:** *What did you do? Fifty-six (56)?*

**PADILLA:** *Yeah [U/I] [SNIFFLES]*

**JONES:** *There's no way, he must've burned it dawg! I mean, just like...I mean.*

[PAUSE]

**PADILLA:** *Yeah, I got more than one (1).*

**JONES:** *No, no! don't say that, dawg. I mean, I ain't down like that, you know what I mean? You get down...*

[VOICES OVERLAP]

**PADILLA:** *I know you ain't I mean...*

**JONES:** *And then my boy is not like that, dawg. Because he knows that everybody I fuck with, fuck these ho's like that. But, I mean you...you're my people 'cause you never do that to me. I don't get down, because I fucked a whole lot, I've been fucking a whole lot. Damn, I got mother fuckers that ...bitch like a mother fucker over one (1)! [U/I]...*

[VOICES OVERLAP]

**PADILLA:** *[U/I] crying like little bitches, man.*

**JONES:** *No, I know. But if you even drop one (1) [U/I] they bitch, dawg. I mean.*

49

| | |
|---|---|
| **PADILLA**: | *I know...it's...fucker's trying not to give me like sixty (60) bucks, if it drops one (1), I'm like, "fuck you."* [CHUCKLES] |
| **JONES**: | *No, no, I know that, dawg. You don't even got...to tell me that.* |

[BACKGROUND: NOISES]

| | |
|---|---|
| **PADILLA**: | *Nuh* [PH] *my cousin is on crack. Later.* |
| **JONES**: | *No, hey, hey!* |
| **PADILLA**: | [LAUGHS] *That fucker is exactly, exact, exact.* |
| **JONES**: | *Well, that's what I'm saying, I know it does, dawg. I don't get down, 'cause I fuck the bitch, dawg.* |
| **PADILLA**: | *No, I know you never do!* |
| **JONES**: | *The only reason why he bitched...because how it looks, he thinks that's the deal, but it's right on point and mine is a little bit, but it dried and it came even the point. Even point.* |
| **PADILLA**: | *Alright, late.* |

[END OF CONVERSATION]

87.     Agents interpret the above conversation as PADILLA reaching out to his cocaine source of supply, JONES, regarding the perceived quality of the cocaine JONES provided him [PADILLA]. During the conversation, as PADILLA was relaying his concerns to JONES, it appeared as if PADILLA was cooking crack from powder cocaine that he received from JONES. By the end of the conversation, it appeared as if PADILLA had successfully created approximately 56 grams (approximately 2 ounces) of crack cocaine, thereby attesting to the quality of the product he had received from JONES and distributed to RUIZ. This call between PADILLA and JONES was prompted by an earlier call, *(also intercepted by agents)*, just prior to this one between PADILLA and RUIZ where RUIZ was complaining to PADILLA about the quality of the cocaine

that PADILLA had provided him. RUIZ was attempting to create crack cocaine from powder cocaine and was not able to obtain the yield that he expected,

88.     Throughout this conversation, JONES told PADILLA that he'd been working with this same batch of cocaine for most of the week, and that JONES didn't have any issues with the cocaine. It was also indicated toward the end of this conversation that PADILLA had more confidence in JONES, and the quality of his cocaine, than he did in his cousin RUIZ's ability to correctly create the crack cocaine from the powder cocaine that PADILLA had provided him.

89.     Additionally, during this conversation between JONES and PADILLA, it was reiterated that PADILLA has been obtaining cocaine from JONES for approximately twenty-four (24) years. Also, JONES and PADILLA appeared to be reassuring one another of the high quality of cocaine, and service, throughout those twenty-four (24) years.

90.     Throughout the investigation agents have identified *"Mark"* as Marcos RUIZ, who is related by blood to the primary target of the investigation, PADILLA. Pursuant to an authorized T-III wiretap, on March 15, 2019, at approximately 9:34 p.m., agents intercepted an outgoing wire communication that lasted approximately 2 minutes and 58 seconds, placed by PADILLA, using PADILLA PHONE 6, to RUIZ. In addition to being PADILLA's cousin, agents believe that RUIZ is one of PADILLA's drug distributors and enforcers in Las Vegas, New Mexico.

[BEGINNING OF CONVERSATION]

| | |
|---|---|
| **RUIZ:** | *Yo.* |
| **PADILLA:** | *Yeah sober your ass up.* |
| **RUIZ:** | *I'm sober fucker.* |
| **PADILLA:** | *You fucked up that's all there is to it. I put it on god.* [U/I] *you too got fifty-five (55) point nine (9). Or…* |

[VOICES OVERLAP]

| | |
|---|---|
| **RUIZ:** | [TISKS] *No and I put 'em* [PH] *all away right away, know what I mean?* [BACKGROUND NOISE]. *And fucking over in the morning I'll, I'll do it again, know what I mean?* But *I should* [STAMMERS], *there's no way it should've happened* [STAMMERS] *like that though, but…* |
| **PADILLA:** | [STAMMERS] *if it was something like that. Did you do it slow? I'm telling you I'm, you already know I ain't* [PH] *gonna* [PH], *why am I gonna* [PH] *throw…* |
| | [VOICES OVERLAP] |
| **RUIZ:** | *I made it with the* [STAMMERS] *on the coffee pot bro, know I mean…* |
| | [VOICES OVERLAP] |
| **PADILLA:** | *Mm-hmm…* |
| | [VOICES OVERLAP] |
| **RUIZ:** | *… 'Cause* [PH] *I didn't have a microwave.* |
| **PADILLA:** | *…I never done…* |
| | [VOICES OVERLAP] |
| **RUIZ:** | [U/I] |
| **PADILLA:** | *…it that way. But I'm telling you* [SNIFFLES] *I just did it right now. Take a picture and send it to you.* [U/I]… |
| | [VOICES OVERLAP] |
| **RUIZ:** | *And uh* [STAMMERS] *homie* [U/I] *everything dude, it's good you know what I mean? But…* |
| **PADILLA:** | *Uh no it's good, both of these. I just did two. I just did two. How am I gonna* [PH] *come up to a key.* |
| **RUIZ:** | *I have it there in the morning I'll do it again when I'm not hungover.* |
| **PADILLA:** | *Good, later.* |
| **RUIZ:** | *I'm gonna* [PH] *try another one.* |

PADILLA:    *No [U/I] just drove off. I know for a fact. If them fuckers will fuck with them they'll come back.*

RUIZ:    *But I couldn't do it all I thought so because if I did them all [U/I] then [STAMMERS] I owed, the other one would miss out on it, know what I mean?*

PADILLA:    *No I know what you're saying but I guarantee they're [STAMMERS] nothing will, they sure won't lose if you do it right. If either got fucked with when I handed it off or did it wrong. 'cause its fucking pure I guarantee it. I know for a fact it is I just did two dude. There's no way you can lose fucking a, a fourteen (14) and I did two and get 'em [PH] you know what I mean.*

RUIZ:    *Oh that's why I was sweating there bro that's why I'm…*

    [VOICES OVERLAP]

PADILLA:    *No I'm telling you…*

    [VOICES OVERLAP]

RUIZ:    *…[U/I] will…*

PADILLA:    *…I'll fucking shit telling you got me all scared. I didn't realize…*

    [VOICES OVERLAP]

RUIZ:    [U/I] *have it* [U/I]…

    [VOICES OVERLAP]

PADILLA:    *…I mean I can have it this week.*

RUIZ:    *Fucking serious as fuck [U/I] fuck with it fuck it, fuck bro. I didn't fucking got it right yet damn doing that.*

PADILLA:    *You [U/I] me, called my homie and everything and he stays on the phone with me, and na [PH] he said, "umm my cousin prolly [PH] just fucking drunk."*

RUIZ:    [U/I] *fucker. It [STAMMERS] the fucken [PH] the math comes out fast it's not that fucking hard you know what I mean?*

PADILLA:    *The what?*

RUIZ:    *I said the math's not that hard when you do it that way, mean?*

PADILLA:    *I know but* [STAMMERS] *how did I just get two I'll send you a picture right now.*

RUIZ:    [U/I] *it's there I put it away* [U/I] *fucking one in* [U/I]...

[VOICES OVERLAP]

PADILLA:    *Good, later fucker.*

RUIZ:    *...do it again bro.*

PADILLA:    *Good. Call me.*

RUIZ:    *I got a fucking headache bro fuck.*

PADILLA:    *You mean an anxiety attack almost. Good brother Ima* [PH]...

RUIZ:    [U/I]

[END OF CALL]



**Photograph of 55.7 grams of crack cocaine made by PADILLA and sent, via electronic communication to Mark on March 15, 2019**

91.    The conversation intercepted in the above wire communication between PADILLA

and RUIZ highlights PADILLA's cocaine distribution, and is a follow up to a conversation that PADILLA had with JONES *(PADILLA's cocaine source of supply)*. Agents interpret the above conversation as PADILLA calling RUIZ and telling RUIZ that he [PADILLA] used cocaine from the same load he shared with RUIZ and successfully created 55.7, *(almost 56.0)*, grams of crack cocaine. PADILLA appears to be reiterating to RUIZ that RUIZ executed the process incorrectly, thereby losing volume. PADILLA also told RUIZ that he would send RUIZ a photograph of the crack cocaine he successfully created. The photograph attached above is the photograph PADILLA sent to RUIZ, via electronic message, of the crack cocaine he made that same day while on the phone while JONES. PADILLA sent this photograph to RUIZ to prove to RUIZ the high quality of the cocaine he provided RUIZ and to reinforce the fact that RUIZ's attempt to turn the cocaine into crack was executed incorrectly.

92.     Additionally, RUIZ is a violent felon who is the primary suspect in a murder that occurred at **TARGET LOCATION 4**. On August 3, 2019, a subject identified as Gilbert MONTOYA and a subject identified as Marcos "Mark" Leonard CARRILLO were shot by RUIZ while in **TARGET LOCATION 4**, which agents believe to be RUIZ's residence. According to information sources relayed to the FBI, MONTOYA and CARILLO were both Westside Locos street gang members. When Las Vegas Police Department ("LVPD") officers responded to **TARGET LOCATION 4**, they found CARRILLO deceased inside **TARGET LOCATION 4**. Officers swept **TARGET LOCATION 4** for firearms, but did not search for drug-related evidence sought by this affidavit. MONTOYA survived the shooting and was able to escape to his mother's house, which was located nearby. MONTOYA was covered in blood and told his mother that RUIZ had shot him. On August 4, 2019, LVPD officers arrested RUIZ in connection with the shootings and the San Miguel County District Attorney's Office has subsequently charged RUIZ

with murder and attempted murder. Also, according to multiple FBI confidential sources, CARRILLO was related to a subject identified as Cruz GALLEGOS, who was murdered on June 15, 2019, and both of the homicides were related to CARRILLO and GALLEGOS having stolen drugs from the PADILLA DTO. The investigation confirmed that Marcos RUIZ was living at the residence on August 4, 2019, and all indications are that RUIZ's property continues to be maintained there by his family.

93.     As of the date of drafting of this affidavit, RUIZ was incarcerated at the San Miguel County Detention Center ("SMCDC") related to his charges of murder and attempted murder. Despite the fact RUIZ is in custody, due to his close association with PADILLA, and his critical role within the PADILLA DTO, as well as his family's continued occupation of his home, agents nevertheless believe that evidence related to the drug trafficking activities of the PADILLA DTO will be located in **TARGET LOCATION 4**.

### E.   *715 Mills Avenue; Las Vegas, NM 87701 (TARGET LOCATION 5)*

94.     Based upon information received from a records check with New Mexico Work Force Solutions, tips from a source of information ("SOI"), and law enforcement surveillance, I know that MARTINEZ currently works as the Branch Manager of the Wells Fargo Bank branch in Las Vegas, New Mexico, identified as **TARGET LOCATION 5**.

95.     On January 21, 2018, a source of information[10] ("SOI") relayed to investigators that PADILLA's girlfriend, who was identified as Sharlett M. MARTINEZ, withdrew approximately $20,000, in cash, from her account in twenty-dollar bills. The SOI further stated that MARTINEZ is the Branch Manager of the Wells Fargo location from which she withdrew the funds.

---

[10] I know that this SOI is a professional colleague of MARTINEZ whose relationship with MARTINEZ is strictly professional. This SOI is not a target or defendant and is not believed to be a PADILLA DTO member.

96.     Based on my knowledge of the case and the work of an agent with the Internal Revenue Service examining MARTINEZ's records, I know that MARTINEZ has in fact made multiple same-day financial transactions in small individual amounts that add up to a much greater total. Based on my experience and conversations with other agents, I understand that these actions are consistent with a person attempting to conceal financial transactions and launder proceeds of illegal narcotics trafficking.

97.     On March 14, 2019, at approximately 10:11 a.m., agents intercepted an outgoing wire communication between PADILLA and an unknown male subject (UM4507), over PADILLA PHONE 6. During a portion of that conversation, UM4507 tells PADILLA that he has money for him and asked when PADILLA will be in Las Vegas, New Mexico so he can give him the money. PADILLA told UM4507 that if he [PADILLA] was not around to just take it to the bank and give it to "his chick." A portion of that conversation is transcribed below:

| | |
|---|---|
| **UM4507:** | *Where you at?* |
| **PADILLA:** | *Albuquerque.* |
| **UM4507:** | *Mm…When you going to Vegas?* |
| **PADILLA:** | *Uh, I don't know, maybe today. Why?* |
| **UM4507:** | *I won't be there today.  Uh … Saturday or Sunday if you go call me so, I can give you some money. I don't want to keep holding on to it and I forget or…you know what I mean?* |
| **PADILLA:** | *Yeah, just give it to my chick or whatever, if I'm not around. Take it into the bank…* |

98.     Agents interpret this excerpt between PADILLA and UM4507 as UM4507 owing PADILLA money for drugs that he [PADILLA] previously provided to UM4507. PADILLA told UM4507 that he would not be in Las Vegas, New Mexico to receive the money and instructed

UM4507 to take the money and give it to his *"chick"* and to *"take it into the bank."* Agents believe

that PADILLA's drug proceeds are laundered by MARTINEZ through her position as the Branch

Manager of the Wells Fargo Bank in Las Vegas, New Mexico.

99.     On April 10, 2019, agents conducted a CS controlled purchase of ten (10) ounces

of crack cocaine and ten (10) ounces of powder cocaine from Robert PADILLA in Albuquerque,

New Mexico. Agents provided the CS with $20,000 in official advanced funds ("OAF") to

purchase the drugs from PADILLA. The controlled purchase was successful, PADILLA arrived

at the appointed location and did, in-fact, provide the CS with ten (10) ounces of crack cocaine

and ten (10) ounces of powder cocaine in exchange for the $20,000 in OAF. Incidentally, when

field tested at the DEA ADO, both of the substances purchased from PADILLA by the CS tested

presumptive positive for cocaine.

100.     Following this CS controlled purchase, on April 11, 2019, agents intercepted

multiple wire and electronic communications, via PADILLA PHONE 6, between PADILLA and

MARTINEZ and between PADILLA and a female subject identified as Lindsay CAVAZOS. In

these conversations PADILLA was working through CAVAZOS, a realtor, in order to purchase a

trailer and the land the trailer sits on, in Las Vegas, New Mexico. PADILLA and CAVAZOS

discuss how the trailer was formerly a methamphetamine laboratory and that the trailer would

require significant renovation/clean-up before it could be lived in or rented out. PADILLA told

CAVAZOS that despite the fact the trailer and land were listed for approximately $21,000,

PADILLA would offer $10,000[11] cash for the trailer and the property. PADILLA stated that he

---

[11] Due to the proximity of this call to the CS controlled purchase that agents conducted with PADILLA on April 10, 2019, agents believe the $10,000 in cash that PADILLA intended to offer for the trailer and the land was half of the $20,000 PADILLA obtained during the CS controlled purchase for twenty (20) ounces of combined cocaine and crack cocaine.

had the cash in hand and even offered to send CAVAZOS a photo of the money as proof. On that same date, during a subsequent conversation between PADILLA and MARTINEZ, PADILLA was discussing the purchase of the trailer with MARTINEZ. PADILLA and MARTINEZ were discussing how to purchase the property and MARTINEZ did acknowledge to PADILLA that the two of them can purchase the trailer and the property. PADILLA told MARTINEZ that he had the money to purchase the property and MARTINEZ replied by *"chuckling"* and telling PADILLA that MARTINEZ will have to remove the money from her 401K. Agents believe that, due to MARTINEZ' occupation as a Wells Fargo branch manager, MARTINEZ is aware of the dangers of purchasing real estate with cash. Therefore, agents believe that MARTINEZ was going to remove the money from her 401K in order to demonstrate a legitimate source for the money used to purchase the trailer and the property, then replace the withdrawal with the money PADILLA obtained through the sale of the cocaine.

101.     On August 15, 2019, pursuant to a Federal search and seizure warrant (19-MR-971) authorized by the Honorable Jerry H. Ritter, United States Magistrate Judge for the District of New Mexico, on August 15, 2019, agents entered and searched Room 310A at the Best Western Plus located at 2020 North Grand Avenue; Las Vegas, NM 87701. Upon entering Room 310A, agents were confronted by Sharlett MARTINEZ and her two (2) minor children. During the search of Room 310A, agents located a large amount of United States currency, which MARTINEZ stated was $5,000. After an official count was conducted, agents were informed the amount of United States currency seized from MARTINEZ totaled $9,950.

102.     Additionally, during the execution of the search warrant (19-MR-971), MARTINEZ agreed to be interviewed by agents. MARTINEZ was informed that a warrant had been issued for Robert PADILLA's arrest on August 6, 2019, by the Honorable Jerry H. Ritter,

United States Magistrate Judge for the District of New Mexico. MARTINEZ stated that she could not get hold of PADILLA, however during execution of the search warrant PADILLA contacted MARTINEZ via her cellular telephone. While in the presence of agents, PADILLA said to MARTINEZ, *"What are they doing to you?"*, *"What are they saying to you?"*, and *"Are you OK?"* MARTINEZ then abruptly hung up the phone. During subsequent conversations with MARTINEZ, she has been very evasive and, despite being asked, she did not provide any assistance to agents with regard to PADILLA's location.

103.    Based on her conversations with PADILLA, her actions to withdraw large amounts of funds in small increments *(consistent with wanting to mask any large single transaction)* while at her workplace, and her knowledge of, and participation in, PADILLA's ongoing efforts to launder money, I believe MARTINEZ to be an integral part of PADILLA DTO. Further, because MARTINEZ's involvement appears to be based around money laundering and occurs within her place of work, I believe that it is likely records and documents related to the illicit financial activities of the PADILLA DTO, and her money laundering tactics, techniques, and procedures, will be found at **TARGET LOCATION 5**.

### *Additional Information Regarding PADILLA*

104.    Despite the fact PADILLA knows that he is a fugitive, PADILLA is still trafficking illegal drugs and trying to conceal his assets from law enforcement. This is evident through the interception of wire and electronic communications obtained via a consensual T-III wiretap with the assistance of a DEA confidential source ("CS").

### *August 25, 2019 Wire Interceptions*

105.    On August 25, 2019, at approximately 7:28 p.m., agents intercepted a wire communication between PADILLA and a DEA CS via a consensual wiretap.

[BEGINNING OF CONVERSATION]

**PADILLA:** *Hey.*

**CS:** *Hey, what's up, bro?*

**PADILLA:** *Nuh [PH] what are you up to?*

**CS:** *I'm fixing a power steering pump. Not power…*

[VOICES OVERLAP]

**PADILLA:** *Uh.*

**CS:** *…steering pump, water pump [U/I] bitch…*

[VOICES OVERLAP]

**PADILLA:** *So…what [U/I]*

**CS:** *…but I just wanted to make sure you got this number.*

**PADILLA:** *Okay, yeah. I got it.*

**CS:** *Cool. Uh…yeah, I'll probably [SIGHS] maybe uh…end of next week, looking at something…what do you suggest?…*

[VOICES OVERLAP]

**PADILLA:** *Next [U/I]*

**CS:** *…you'll be around? Or…should I just let you know or text? Or…*

**PADILLA:** *Just tell me the day, give me two (2) days in advance.*

**CS:** *Yeah? Right on. Um…if I…do you want me to… [STAMMERS] 'cause there's a chance I might be coming that way too, whatever…*

[VOICES OVERLAP]

**PADILLA:** *[U/I] in Albuquerque area at all.*

**CS:** *Huh?*

**PADILLA:** *I don't wanna be in the Albuquerque area.*

61

CS:            *Uh, you're not gonna be?*

PADILLA:       *Yeah, no.*

CS:            *What?*

PADILLA:       *I'll go to you.*

CS:            *Uh, okay. Yeah. That's crazy, yeah, I was thinking about that shit you were telling me, man. That sucks!*

PADILLA:       *Yeah, I know, bunch of bullshit.*

CS:            *Uh, but...you lost your car?*

PADILLA:       *Huh?*

CS:            *You lost your car?*

PADILLA:       *Nuh [PH] they freaking...they took they...they repossessed my fucking Yukon, and my two (2) fucking... the cars they couldn't get. But, they got my...they got two (2) Harleys and the Yukon, that's all they could find. Everything else is scatter everywhere...all over the place.*

CS:            *Shit...fucked up.*

PADILLA:       *Yeah...*

               [VOICES OVERLAP]

CS:            *Oh, fuck! What...*

PADILLA:       *...[U/I]*

CS:            *...[STAMMERS] and what about your Corvette?*

PADILLA:       *It's [U/I]*

CS:            *You still got it?*

PADILLA:       *Yeah, I got it. I don't want it, all they're gonna do is fucking repossess it, and give it back to the bank, anyways.*

CS:            *What's that?*

PADILLA:       *They'll take it away...*

[VOICES OVERLAP]

**CS:**    *I didn't catch that.*

**PADILLA:**    *...they'll take it away and give it to the bank.*

**CS:**    *Oh, they will?*

**PADILLA:**    *Yeah, that's what they usually do.*

**CS:**    *What...what do you owe on it?*

**PADILLA:**    *I don't really know...*

[VOICES OVERLAP]

**CS:**    *Yeah.*

**PADILLA:**    *...like forty (40).*

**CS:**    *Alright, I'll [STAMMERS] I'll be interested in it, if you wanna get rid of it...possibly.*

**PADILLA:**    *[U/I] money worth for the [U/I]*

**CS:**    *Uh [U/I]*

**PADILLA:**    *Yeah, no good deal, that's for sure.*

**CS:**    *That's...that's [U/I] though, you don't know what's gonna happen, uh?*

**PADILLA:**    *Yeah...no, I just gotta wait it out and see what kind of bullshit they'll try to put on me.*

**CS:**    *Uh, you gotta [U/I] feeling, uh?*

**PADILLA:**    *Huh?*

**CS:**    *[U/I] you're thinking about that.*

**PADILLA:**    *Oh, it's fucking horrible. But, it is what it is, though.*

**CS:**    *Uh. What you girl thinks?*

**PADILLA:**    *She fucking...I'm pretty sure she's scared shitless, she's not even talking to me.*

63

CS:            *Oh, fuck...*

               [VOICES OVERLAP]

PADILLA:       *They...*

CS:            *...[U/I]*

PADILLA:       *...yeah, they took her phone and shit, it's hard to get a hold of her.*

CS:            *They took her phone?*

PADILLA:       *Yeah.*

CS:            *Oh, dude* [PAUSE] *Oh, shit! You think they got my number, or what?*

PADILLA:       *No, they didn't take my phone.*

CS:            *Oh, good* [PAUSE] *Alright. I'm just a little freaked out, you know? I was like, "what the fuck?"*

PADILLA:       *Yeah. No, shit, that makes two (2) of us.*

CS:            [U/I] *like...like a lot of stuff for them to do. You know?*

PADILLA:       *Yeah. But...yeah, this is crazy. Gotta figure out why uh... who caused all this shit.*

CS:            *Yeah. Well, let's be real careful, I guess. You know?*

PADILLA:       *Yeah...always.*

CS:            *Alright. Well, if you hear anything and...give me heads up if you know some more* [CHUCKLES] *you know.*

PADILLA:       *Yeah, for sure I will* [CHUCKLES] *I got your number.*

CS:            *Alright, bro* [U/I] *Alright, I'll* [STAMMERS] *I'll let you know, and...um..."I'm ready" and...we'll go from there.*

PADILLA:       *Okay, sounds good.*

CS:            *Alright, bro. Take it easy, bro.*

PADILLA:       *You too. Later.*

CS:                          *Later.*

[END OF CONVERSATION]

106.    In this conversation, PADILLA made it clear to the CS that he did not want to go to Albuquerque, and that PADILLA would travel to meet the CS. This, agents believe, was due to the fact PADILLA wanted to sell the CS illegal drugs. When the CS asked PADILLA, *"I'll probably [SIGHS] maybe uh...end of next week, looking at something...what do you suggest?"* The CS was relaying to PADILLA that he/she may be able to purchase drugs from PADILLA at that time. PADILLA then told the CS, *"Just tell me the day, give me two (2) days in advance,"* which agents believe was PADILLA relaying to the CS that he needed that time to pick up his drugs and prepare to transport them to the CS's residence in a neighboring state. Additionally, when the CS told PADILLA that he/she may be in the Albuquerque area, to which PADILLA told the CS, *"I don't wanna be in the Albuquerque area,"* and followed with *"I'll go to you."* Agents believe that PADILLA does not want to conduct business in Albuquerque for fear of being arrested and, therefore, feels more secure in conducing the illegal drug transaction with the CS elsewhere.

107.    The CS and PADILLA have developed a relationship with regard to the buying and selling of drugs for approximately a year and a half. After the DEA recruited this CS, the CS was able to conduct two (2) successful controlled purchases from PADILLA which resulted in a combined acquisition of eighteen (18) ounces of crack cocaine and twenty-two (22) ounces of powder cocaine for a combined total of $40,000. Based upon this relationship, and the fact PADILLA has never provided this CS drugs in advance of full payment, agents believe that PADILLA is attempting to exploit this relationship to dispose of a portion of his remaining drug supply and acquire a significant sum of money to assist him in avoiding law enforcement efforts to apprehend him.

108.     Additionally, during this conversation PADILLA indicates that he is aware that if located, that law enforcement will seize his 2016 Chevrolet Corvette and return it to the bank. PADILLA relayed to the CS that the remainder of his vehicles are disbursed, *"Everything else is scatter everywhere…all over the place."* Agents believe this is an attempt by PADILLA to hide his assets from law enforcement because he knows that his assets are subject to seizure by law enforcement.

### September 7, 2019 Wire Interceptions

109.     On September 7, 2019, at approximately 4:57 p.m., agents intercepted a wire communication between PADILLA and a DEA CS via a consensual wiretap.

[BEGINNING OF CONVERSATION]

| | |
|---|---|
| **CS:** | *Green Star.* |
| **PADILLA:** | *What up, XXXX?* |
| **CS:** | *Who's this?* |
| **PADILLA:** | *Come on, bro', it's your boy.* |
| **CS:** | *Uh, is this Ziggy?* [PH] |
| | [VOICES OVERLAP] |
| **PADILLA:** | *Corvette…Nah, it's Corvette.* |
| **CS:** | Oh, what's up, man? |
| **PADILLA:** | *Nah, what are you doing?* |
| **CS:** | *Uh, just working,* [SIGHS] *Kinda chillin' right now though, what are you doing?* |
| **PADILLA:** | *I was…nah, seeing how everything's going.* |
| **CS:** | *Yeah, just kinda chillin', moving some cars around. What's going on?* |
| **PADILLA:** | *Nah, I cleared up all my shit, finally.* |

66

**CS:**    *Oh good, what was it?*

**PADILLA:**    *Tsk, fuckin'...just my cousin did some stupid shit, and they think I...they just questioned me for murder, my role in a murder.*

**CS:**    *Oh fuck.*

**PADILLA:**    *Hey, but I was gonna go up to Colorado Springs this weekend, so I thought we could hang out.*

**CS:**    *Yeah. Uh, what? This weekend?*

**PADILLA:**    *Yeah.*

**CS:**    *[SIGHS] I'm...Well, I'm kinda...well, I got some shit going on with the kids but...why? What's up?*

**PADILLA:**    *Nah, we're just gonna go hang out up there, get the fuck away.*

**CS:**    *Yeah, well let me know if you come in town, I...I'm not...*

    *[VOICES OVERLAP]*

**PADILLA:**    *I'm gonna stay the weekend.*

**CS:**    *Yeah, I'm not really ready for anything, right now.*

**PADILLA:**    *Oh, that's not good. You're just...fucking sitting on everything or what?*

**CS:**    *Nah, I'm just kinda taking a break. You know? Kinda... kinda freaked me out with that last shit. You telling me about.*

    *[VOICES OVERLAP]*

**PADILLA:**    *Oh, yeah.*

**CS:**    *Well, that's cool. So, it's nothing real, huh? [ASIDE: [U/I]]*

    *[VOICES OVERLAP]*

**PADILLA:**    *Not at all.*

**CS:**    *Nice.*

PADILLA:        *But, uh…yeah, I'll text you Friday or so.*

CS:             *Next Friday?*

PADILLA:        *This coming Friday…yeah next week. I'm gonna be…*

                [VOICES OVERLAP]

CS:             *Yeah.*

PADILLA:        *…yeah next Friday. I'll be there…I'm in Salt Lake, so…I'll be there*

                [VOICES OVERLAP]

CS:             *Well, give, give me, uh…give me some notice so that way I can grab…get something put together then. If everything is cool. You know?*

                [VOICES OVERLAP]

PADILLA:        *Yeah. Well, I'm, I'm gonna be there no matter what, so whatever.*

CS:             *Cool. Right on. Well that's good news, man.*

                [VOICES OVERLAP]

PADILLA:        *Alright then.*

CS:             *Yeah, I was, I was…*

                [VOICES OVERLAP]

PADILLA:        *Yeah, I know.*

CS:             *…worried about you, bro'. Honestly I…*

                [VOICES OVERLAP]

PADILLA:        *Well I thought it was something else, so I was like, "Fuck." I was like, "Which of my friends snitched me out?" 'Cause I only fuck with family.*

                [VOICES OVERLAP]

CS:             *Well…why would the take your car? Shit don't…*

                68

[VOICES OVERLAP]

**PADILLA:**     *For look for bullets.*

**CS:**     *Oh, fuck. Crazy. [SIGH] Well, dude I'm, that's relieving. I was like, "Uh, shit." You know? You never know what's gonna happen with… 'till a guy goes down.*

**PADILLA:**     *Yeah, they pulled out all kinds of…shit load, they took two guns out of there, but obviously, the bullets doesn't match.*

**CS:**     *Yeah, yeah.*

[VOICES OVERLAP]

**PADILLA:**     *They won't give me my shit back, they gave me my car back but not my shit.*

**CS:**     *Uh, fuck. Well, um…what number should I call you at? The same one?*

**PADILLA:**     *I'm gonna buy another one, and I'll…I'll send it to you.*

**CS:**     *Okay, yeah, I'll be ready, man. I was just a little freaked out honestly, that's why I hadn't called you.*

**PADILLA:**     *Nah, that's all good.*

**CS:**     *You know what I mean, no?*

[VOICES OVERLAP]

**PADILLA:**     *Everything is good though, on my part.*

**CS:**     *Okay, cool. I just wanted to make sure before, we…you, you never know.*

**PADILLA:**     *Nah, yeah, no of course. No. uh…I keep my shit straight.*

[VOICES OVERLAP]

**CS:**     *I got, I got…I got too much to lose. [CHUCKLES]*

**PADILLA:**     *I hear you, tell me about it.*

**CS:**     *Yeah. Well good, man.*

[VOICES OVERLAP]

69

| | |
|---|---|
| **PADILLA:** | *I'll just pop up and anything, whatever you I'll take, I'll have whatever, you know what I mean? I'm gonna go talk to you anyways and then…* |
| | [VOICES OVERLAP] |
| **CS:** | *Yeah.* |
| **PADILLA:** | *…whatever you want I can, I'll have it come out, you know?* |
| **CS:** | *Cool. Alright, man. Sounds good.* |
| **PADILLA:** | *Alright. Later, brother.* |
| | [VOICES OVERLAP] |
| **CS:** | *Alright, later. I'm glad you're good.* |
| **PADILLA:** | *Okay.* |

[END OF CONVERSATION]

110.    Agents interpret this intercepted wire communication between the CS and PADILLA as PADILLA, once again, trying to distribute illegal drugs to the CS. PADILLA asked the CS if he wanted to *"hang out"* with him in Colorado Springs during an upcoming weekend. When PADILLA mentioned this to the CS, the CS told PADILLA that he wasn't really looking to purchase any drugs. PADILLA replied with, *"Oh, that's not good. You're just…fucking sitting on everything or what?"* Agents interpret this question as PADILLA attempting to ascertain why the CS didn't need, or want, any drugs from PADILLA…most likely due to the amount of time that had passed since the CS last acquired illegal drugs from PADILLA. Later on in the conversation, PADILLA told the CS, *"I'll just pop up and anything, whatever you I'll take, I'll have whatever, you know what I mean? I'm gonna go talk to you anyways and then…"* Agents interpret this statement to mean that PADILLA was going to Colorado regardless and he will have drugs with

70

him that the CS can purchase.

111.    Additionally, during this conversation PADILLA relayed to the CS that he was clear of any interest regarding law enforcement. PADILLA said that the police questioned him for his "role in a murder". To my knowledge, PADILLA is still a fugitive and has not been questioned with regard to his role in any criminal activity up to this point. Currently PADILLA is still a Federal fugitive and the DEA, with the assistance of the USMS, are actively trying to locate him.

## IX.    **REQUEST FOR NIGHT TIME SERVICE**

112.    I am requesting the Court authorize the DEA to serve these warrants prior to 6:00 a.m., as set forth under Federal Rules of Criminal Procedure 41(e)(2)(A)(ii). Agents and officers will be attempting to serve the requested search warrants, and related arrest warrants, in closely coordinated and simultaneous raids. Multiple DEA enforcement groups, DEA Special Response Team ("SRT"), Homeland Security Investigations ("HSI") SRT, and DEA Intelligence Analysts have been briefed on this operation and will be utilized to execute the search warrants. FBI tactical teams will be working in conjunction with the DEA teams and serving search warrants in some of the same neighborhoods. Meanwhile, Syndicato de Nuevo Mexico ("SNM") members within the Penitentiary of New Mexico ("PNM") in Santa Fe, New Mexico, Central New Mexico Correctional Facility ("CNMCF") in Los Lunas, New Mexico, Santa Fe County Adult Detention Center ("SFCADC") in Santa Fe, New Mexico, the Metropolitan Detention Center ("MDC") in Bernalillo County, New Mexico, and the United States Bureau of Prisons ("BOP") will be searched by corrections officials. I am requesting the Court authorize the DEA to serve the requested search warrants outside daytime service hours for a number of factors:

> a.   The search warrants will need to be executed in a closely coordinated and simultaneous sequence;

b. The locations and persons to be searched are spread over a significant distance and in different cities around New Mexico;

c. Many of the **TARGET LOCATIONS**, (and FBI SUBJECT PREMISES), are believed to be equipped with cameras;

d. Firearms are believed to be present at many **TARGET LOCATIONS** (and FBI SUBJECT PREMISES);

e. The majority of the target subjects have extensive criminal histories or are believed to be involved in violence;

f. Many of the **TARGET LOCATIONS** (and FBI SUBJECT PREMISES) are located near schools and/or school bus stops and agents would like to avoid school-age children congregating in the vicinity of the bus stops or otherwise travelling through the respective neighborhoods toward schools. I believe that many of the schools located near the **TARGET LOCATIONS** (and FBI SUBJECT PREMISES) start as early as 7:45 a.m.

113.    Therefore, I am requesting authorization to serve the requested search warrants at any time of the day or night. With the Court's authorization, I will instruct DEA teams, and the supporting HSI teams, to begin serving the search warrants at approximately 4:00 a.m., simultaneously, and in coordination with, the FBI tactical teams.

## CONCLUSION

114.    Based on the foregoing information, there is probable cause to believe that PADILLA, and members of the PADILLA DTO, are engaged in drug trafficking and have committed, are committing, and will continue to commit, violations of *21 U.S.C. § 841 - distribution of controlled substances and possession with intent to distribute controlled substances;*

72

*21 U.S.C. § 846* - *conspiracy to distribute and possess with intent to distribute controlled substances; 18 U.S.C. § 1956 – laundering of monetary instruments; 18 U.S.C. § 1957 – engaging in monetary transactions in property derived from specified unlawful activity; 18 U.S.C. § 1071 – Harboring a fugitive; 18 U.S.C. § 1510 – Obstruction of justice; and 18 U.S.C. § 2 – aiding and abetting,* and that PADILLA, and members of the PADILLA DTO, are using the **TARGET LOCATIONS 1-4** to facilitate the commissions of these offenses.  I also believe **TARGET LOCATION 5** is being used to facilitate the commission of 21 U.S.C. § 846, and 18 U.S.C. §§ 1956 and 1957.

115.    Based upon the information provided in this affidavit, I believe the items to be seized, which are described in Attachment B1 for the property to be searched, as described in Attachment A1 through Attachment A5, will constitute admissible evidence of the violations outlined in this affidavit. Also based upon this information, I believe the items to be seized, which are described in Attachment B5 for the property to be searched, as described in Attachment A5, will constitute admissible evidence of the violation outlined in this affidavit.

I swear that this information is true and correct to the best of my knowledge and belief.


Thomas D. Long, Special Agent
Drug Enforcement Administration


Subscribed and sworn to before me this 16th day of September, 2019.


THE HONORABLE KAREN B. MOLZEN
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A-1

### DESCRIPTION AND PHOTOS OF PROPERTIES TO BE SEARCHED

### TARGET LOCATION 1

1517 Romero Street; Las Vegas, New Mexico 87701 is a large property containing a single-story residence constructed of wood frame with a white exterior and a blue "pitch-style" roof. The residence is surrounded by a brown wooden fence with a metal gate facing the street. The property also includes a large brown structure with a pitched silver/grey tin corrugated roof on the west end of the property with a detached "shed" type building with grey exterior walls, a wooden door, and an inclined silver/grey tin corrugated roof. Additionally, on the north edge of the property, adjacent to Grant Street, the property contains two "stand-alone" shed-type buildings with tan/brown exterior walls and silver/grey roofs and another "stand-alone" shed-type building, white in color with a white roof. Agents will search all buildings, vehicles, sheds, and areas located within the curtilage of the property.

The Parcel ID of the property is: 1-094-092-203-341.

The Legal Description/Summary of the property is: SUBD: TOWN OF LAS VEGAS LOT: 1 TRACT 157 SUBD: TOWN OF LAS VEGAS LOT: 2 TRACT 157 NORTH ½ S: 27 t 16 R: 16.









## ATTACHMENT A-2

## DESCRIPTION AND PHOTOS OF PROPERTIES TO BE SEARCHED

## TARGET LOCATION 2

1034 Railroad Avenue; Las Vegas, New Mexico 87701 is a single-story residence, white in color, with a blue "pitch-style" roof. The residence has a short cinder block type wall encompassing the front entrance and barred windows and front door. The TARGET LOCATION has a rear deck and security doors on the rear of the property. On the north end of the target location the property contains a tan "pre-fabricated" style shed with a pitched roof and a single access door on the east side of the shed. Agents will search all buildings, vehicles, sheds, and areas located within the curtilage of the property.

The Parcel ID of the property is: MOBILE HOMES.

The Legal Description of the property is: S: 0 T: 0 R: 0 SERIAL: HOTX09910407AB YEAR 2000 MAKE: OAKW – 176 SIZE: 52 X 28.





**ATTACHMENT A-3**

**DESCRIPTION AND PHOTOS OF PROPERTIES TO BE SEARCHED**

**TARGET LOCATION 3**

901 Commerce Street; Las Vegas, New Mexico 87701 is a single-story residence, yellow in color, with a grey/white "pitch-style" roof that sits on a corner lot. The residence is surrounded by trees and a "chain-link" style fence. A "KEEP OUT" sign is affixed to the fence, and to a tree, in front of the residence. The property also contains a small "shed-type" structure on the north side of the TARGET LOCATION with a pitched/slanted roof that appears grey in color. Agents will search all buildings, vehicles, sheds, and areas located within the curtilage of the property.

The Parcel ID of the property is: 1-095-093-373-209.

The Legal Description of the property is: SUBD: HENRIQUEZ & HP & HST CO LOT: 32-34 BLOCK: 8 TRACT: 32-34 S: 23 T: 16 R: 16.





## ATTACHMENT A-4

### DESCRIPTION AND PHOTOS OF PROPERTIES TO BE SEARCHED

### TARGET LOCATION 4

615 Union Street; Las Vegas, New Mexico 87701 is a single-story residence, grey in color, with a blue/grey "pitch-style" roof and a covered car port on the south end of the TARGET LOCATION. The residence is surrounded by a brown wooden fence with multiple "KEEP OUT" signs affixed around the fence. The property also contains a shed-type structure on the northwest side of the TARGET LOCATION that appears white/grey in color with a grey pitched style roof. The residence has a blue and white children's swing set in the front yard, adjacent to the street. Agents will search all buildings, vehicles, sheds, and areas located within the curtilage of the property.

The Parcel ID of the property is: 1-094-092-465-099.

The Legal Description of the property is: SUBD: TOWN OF LAS VEGAS LOT: 7 BLOCK: 105 SUBD: TOWN OF LAS VEGAS LOT: 8 BLOCK: 105 S: 27 T: 16 R: 16 DESC N PLAT BK 54 PG 79.









## ATTACHMENT A-5

## DESCRIPTION AND PHOTOS OF PROPERTIES TO BE SEARCHED

## TARGET LOCATION 5

Wells Fargo Branch located at 715 Mills Avenue; Las Vegas, New Mexico 87701 is a single-story commercial building, brown/tan in color, with a flat roof and a customer "drive-thru" attached to the rear of the structure. The building has a red "stand-alone" sign identifying the business as "Wells Fargo" and has a parking lot at the front of the building.

The area to be searched is the Branch Manager's office inside the building. Agents will search the branch manager (MARTINEZ') office and any other areas within the TARGET LOCATION, that may conceal the items as described in ATTACHMENT B5, where MARTINEZ, as the branch manager, may have sole dominion and control *(such as file cabinets, credenzas, drawers, store rooms)*.



**ATTACHMENT B1**

**PROPERTY TO BE SEIZED**

All records, information, and evidence relating to violations of 21 U.S.C. § 841, 21 U.S.C.

§ 846, 18 U.S.C. § 1070, 18 U.S.C. § 1510, and 18 U.S.C. § 2, including:

1.  Controlled substances, including, but not limited to, cocaine, cocaine base, methamphetamine, heroin, oxycodone pills, fentanyl pills, and marijuana.

2.  Drug paraphernalia, including but not limited to, scales, packaging materials, items for packaging and handling drugs.

3.  Large amounts of currency, financial instruments, precious metals, jewelry and other items of value and/or proceeds of drug transactions.

4.  Any and all drug customer lists, drug records, dealers lists, or any notes containing the individual names of such persons, telephone numbers, addresses of these customers or dealers, and any corresponding records of accounts receivable, money paid or received, drugs supplied or received, or cash received to pay for controlled substances or intended to pay for controlled substances.

5.  Telephone and address books or notes containing telephone numbers and addresses of co-conspirators.

6.  Telephone toll records for homes and/or businesses owned or controlled by suspected co-conspirators, or other communication devices used by them and/or their drug trafficking associates.

7.  Messages, notes, correspondence, and/or communications between drug trafficking associates.

8.  Indications of ownership or control of said premises and/or other premises used in unlawful drug trafficking activity, including but not limited to, utility bills, cancelled checks, or envelopes and deeds or leases.

9.  Indications of ownership or control over any vehicles located at the place to be searched, including but not limited to, titles, registrations, gas receipts, repair bills and keys belonging to that vehicle.

10. Records, receipts, bank statements and records, money drafts, letters of credit, money orders and cashier's checks received, passbooks, bank checks, safe deposit box keys, vault keys, safes and other items evidencing the obtaining, secreting and/or concealment, and or expenditures of money.

11. Any and all financial or other instruments evidencing placement of assets in the names other than the names of the drug traffickers themselves.

12. Books, records, receipts, diaries, notes, ledgers, airline tickets, cashier's checks, money orders and other papers relating to the transportation, ordering, sale and distribution of controlled substances and the outstanding debts and collections from controlled substances that have been distributed.

13. Photographs or videos of the drug traffickers, their co-conspirators and the property and assets purchased with drug proceeds.

14. Other financial records, which may include airline ticket receipts, credit card receipts, rental car receipts and luggage tags reflecting points of travel.

15. Firearms and ammunition, including but not limited to handguns, rifles, shotguns and automatic weapons.

16. Property constituting evidence of the commission of the criminal offenses of 21 U.S.C. § 841, 21 U.S.C. § 846, 18 U.S.C. § 1070, 18 U.S.C. § 1510 and 18 U.S.C. § 2; contraband, and property designed and intended for use as the means for committing the criminal offenses of 21 U.S.C. § 841, 21 U.S.C. § 846, 18 U.S.C. § 1070, 18 U.S.C. § 1510 and 18 U.S.C. § 2; as well as paraphernalia used to prepare controlled substances for distribution and personal use.

17. Any and all computers and storage media that reasonably appear to contain some or all of the records, information, and/or evidence described in Attachment B.

As used above, the terms *"records"* and *"information"* includes all forms of creation or storage, including any form of computer or electronic storage *(such as hard disks or other media that can store data)*; any handmade form *(such as writing)*; any mechanical form *(such as printing or typing)*; and any photographic form *(such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies)*.

The term *"computer"* includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions,

including desktop computers, notebook computers, mobile phones, smartphones, tablets, server computers, and network hardware.

The terms *"storage medium"* or *"storage media"* include any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

## ATTACHMENT B5

## PROPERTY TO BE SEIZED

All records, information, and evidence relating to violations of 21 U.S.C. § 841, 21 U.S.C.

§ 846, 18 U.S.C. § 1956, 18 U.S.C. § 1957, and 18 U.S.C. § 2, including:

1. Large amounts of currency, financial instruments, precious metals, jewelry and other items of value and/or proceeds of drug transactions.

2. Any and all drug customer lists, drug records, dealers lists, or any notes containing the individual names of such persons, telephone numbers, addresses of these customers or dealers, and any corresponding records of accounts receivable, money paid or received, or cash received to pay for controlled substances, or intended to pay for controlled substances.

3. Telephone and address books or notes containing telephone numbers and addresses of co-conspirators.

4. Telephone toll records for homes and/or businesses owned or controlled by suspected co-conspirators, or other communication devices used by them and/or their drug trafficking associates.

5. Messages, notes, correspondence, and/or communications between drug trafficking associates.

6. Indications of ownership or control of other premises used in unlawful drug trafficking activity, including but not limited to, utility bills, cancelled checks, or envelopes, and deeds or leases.

7. Indications of ownership or control over any vehicles used to facilitate drug trafficking, including but not limited to, titles, registrations, gas receipts, repair bills, and keys belonging to that vehicle.

8. Records, receipts, bank statements and records, money drafts, letters of credit, money orders and cashier's checks received, passbooks, bank checks, safe deposit box keys, vault keys, safes and other items evidencing the obtaining, secreting and/or concealment, and or expenditures of money.

9. Any and all financial or other instruments evidencing placement of assets in the names other than the names of the drug traffickers themselves.

10. Books, records, receipts, diaries, notes, ledgers, airline tickets, cashier's checks, money orders and other papers relating to the transportation, ordering, sale and

distribution of controlled substances and the outstanding debts and collections from controlled substances that have been distributed.

11. Photographs or videos of the drug traffickers, their co-conspirators and the property and assets purchased with drug proceeds.

12. Other financial records, which may include airline ticket receipts, credit card receipts, rental car receipts and luggage tags reflecting points of travel.

13. Any and all computers and storage media that reasonably appear to contain some or all of the records, information, and/or evidence described in Attachment B5.

As used above, the terms *"records"* and *"information"* includes all forms of creation or storage, including any form of computer or electronic storage *(such as hard disks or other media that can store data)*; any handmade form *(such as writing)*; any mechanical form *(such as printing or typing)*; and any photographic form *(such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies)*.

The term *"computer"* includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, smartphones, tablets, server computers, and network hardware.

The terms *"storage medium"* or *"storage media"* include any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.